1997 OK 137

**Minnie HARDER, as Administrator of the Estate of Ethel Kayser, Plaintiff–Appellant,**

v.

**F.C. CLINTON, INC. d/b/a Heritage Care Center, Defendant–Appellee.**

**No. 86426.**

Supreme Court of Oklahoma.

Nov. 4, 1997.

Rick Bisher, Boettcher, Ryan & Martin, Oklahoma City, for Plaintiff–Appellant.

James M. Kaufman, Michael S. McMillin, Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, for Defendant–Appellee.

OPALA, Justice.

The dispositive question before this court is whether the trial court erred by directing a verdict for the defendant at the close of the plaintiff's evidence that followed a *res ipsa loquitur* pattern of proof. We answer in the affirmative.

## I

### THE ANATOMY OF LITIGATION

Ethel Kayser [Kayser] was admitted on July 14, 1992 to the Heritage Care Center [Heritage, Center, or nursing home]. On the evening of September 30, 1992 she was transferred to the Clinton Regional Hospital after ingesting an overdose of Tolbutamide, a diabetic medication. There she was diagnosed as having a hypoglycemic coma caused by the lowering of her blood sugar from ingestion of the medication. An intravenous device was inserted in the dorsum area of her right foot to treat the coma. Gangrene later developed in the same foot, which eventually required an above-the-knee amputation.

Minnie Harder [Harder], Kayser's sister, brought a suit against the nursing home, as Kayser's guardian,[1] for harm caused to Kayser by an overdose of the wrong prescription administered to her while she was in the Center's care and custody.[2] At the close of Harder's case, which followed a *res ipsa loquitur* pattern of proof, the trial court, on Heritage's demurrer to the evidence, directed a verdict for the nursing home. The trial court ruled that Harder's evidence fell short of establishing a negligence claim because her proof failed to show all the requisite foundational elements for *res ipsa loquitur*. The Court of Civil Appeals affirmed.

## II

### STANDARD OF REVIEW FOR TESTING A DIRECTED VERDICT

Because the record contains some evidence adduced (without objection) by the defendant before the plaintiff had rested, and the order in the record treats the ruling as a "directed verdict," [3] we will review the dispositive ruling as a judgment on directed verdict.

The legal standard that governs motions for directed verdict and those for summary judgment is very similar, if not

1. Harder also sued Mike Fogarty (*qua* owner of the Heritage Care Center) and Amity Care Corporation (the management company for the Center). Both parties were dismissed from suit without prejudice to refiling.

2. Kayser died before the case went to trial. Harder prosecuted the lawsuit as administratrix of Kayser's estate.

3. During the presentation of the plaintiff's case, the trial court admitted, *sans* objection, various exhibits offered by both the plaintiff and the defendant. At the close of the plaintiff's case, the defendant "demurred to the plaintiff's proof." The demurrer was "sustained." Although the journal entry refers to the ruling as "a directed verdict," and its memorial as well as the briefs characterize the critical ruling in that manner, a preferred description of the dispositive decision

indeed identical.[4] Neither may be sustained unless there is an entire absence of proof on a material issue. Both should be denied when there are questions of material fact or reasonable persons could differ as to the choice of inferences to be drawn from the facts in evidence.[5] In determining whether a plaintiff's evidence is sufficient to withstand a motion for directed verdict, *the trial court must consider as true* all evidence favorable to the plaintiff together with all reasonable inferences to be drawn from it, and *disregard all conflicting evidence favorable to the movant.*[6] Only if all the inferences to be drawn from the evidence are in favor of the moving party will a directed verdict withstand appellate scrutiny.

## III

### THE *RES IPSA LOQUITUR* PATTERN OF PROOF

Harder urges that the trial court erred when it directed a verdict for Heritage based on its ruling that she had not satisfied the requirements for a *res ipsa loquitur* submission. According to Harder, a directed verdict was inappropriate because she adduced reasonably supportive evidence to establish the foundation facts for application of the *res ipsa loquitur* pattern of proof. Heritage counters that Harder cannot invoke the *res ipsa loquitur* evidentiary process because she failed to establish *two* foundation facts [7] —(a) the *thing* causing the injury (the Tolbutamide) was under its exclusive control and (b) but for the negligence in administering an overdose of the wrong medication, the harm of which plaintiff complains would not have occurred.

■■■ *Res ipsa loquitur*[8] is a pattern of proof [9] which may be followed when an injury is alleged to have been negligently inflicted and the harm is shown *not to occur* in the usual course of everyday conduct unless a person who controls the instrumentality *likely to have produced that harm* fails to exer-

---

now on review might be *judgment on sustaining the defendant's demurrer to the evidence.*

4. *Handy v. City of Lawton*, 1992 OK 101, 835 P.2d 870, 873; *Roach v. Atlas Life Ins. Co.*, 1989 OK 27, 769 P.2d 158, 163.

5. *Jackson v. Oklahoma Memorial Hosp.*, 1995 OK 112, 909 P.2d 765, 773; *Handy, supra* note 4 at 873; *Roach, supra* note 4 at 163; *Fletcher v. Meadow Gold Co.*, 1970 OK 135, 472 P.2d 885, 888. Where *res ipsa loquitur* is invoked, the focus on review of a judgment on demurrer or on directed verdict (or of summary judgment) is *not on* the sufficiency of evidence (or evidentiary material), but rather *on* whether, in light of the applicable pattern of proof which is a plaintiff's due under that doctrine, the record as a whole (a) shows *undisputed facts* on the material issues and (b) will support *a single inference* in favor of a movant's quest for relief. *Jackson, supra* at 773. *See in this connection Handy, supra* note 4 at 873; *Roach, supra* note 4 at 163; *Fletcher, supra* at 888.

6. *Fleming v. Baptist General Convention*, 1987 OK 54, 742 P.2d 1087, 1091–92; *Condo v. Beal*, 1967 OK 30, 424 P.2d 48, 51; *Orthopedic Clinic v. Hanson*, 1966 OK 119, 415 P.2d 991, 995; *Sisler v. Whitten*, 1964 OK 71, 393 P.2d 497, 503; *Price v. Smith*, 1962 OK 173, 373 P.2d 242, 244.

7. *See infra* note 12 for the *res ipsa loquitur* foundation facts.

8. The Latin phrase *"res ipsa loquitur"* ("the things speaks for itself") had its origin in a statement by Erle, C.J., in Scott v. London and St. Katherine's Docks Co., Ex. Ch., 3 H & C 596, 601, 159 Eng.Rep. 665, 667 (1865):

"There must be reasonable evidence of negligence. But where the thing is shown to be under the management of the defendant or his servants, and the accident is such, as in the ordinary course of things, that it does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care."

*See* Cooke & Oughton, COMMON LAW OF OBLIGATIONS, 180 (Butterworths 1993). The evidentiary principle was introduced by Baron Pollock in an 1863 English case where a barrel of flour rolled out a warehouse window and fell upon a pedestrian. Byrne v. Boadle, 2 H & C 722, 159 Eng.Rep. 299 (1863). *See also Hake v. George Wiedemann Brewing Co.*, 23 Ohio St.2d 65, 262 N.E.2d 703 (1970) (decided on substantially identical facts).

9. Although oftentimes labeled a "doctrine", *res ipsa loquitur is not a rule of substantive law, but is rather a principle of evidence. See Hoven v. Kelble*, 79 Wis.2d 444, 256 N.W.2d 379, 381 (1977) (quoting *Szafranski v. Radetzky*, 31 Wis.2d 119, 141 N.W.2d 902, 908 (1966)), where the court notes:

" '. . . The doctrine of *res ipsa loquitur* is, of course, not a rule of pleading but a doctrine from the *law of evidence* that permits an inference of the defendant's negligence without any direct testimony as to his conduct at the very time such negligence occurred.' " (Emphasis supplied.)

cise due care to prevent its occurrence.[10] The purpose of the *res ipsa loquitur* evidentiary rule is to aid a plaintiff in making out a prima facie case of negligence in circumstances when direct proof of why the harm happened is beyond the power or knowledge of the plaintiff.[11] Once the foundation facts for *res ipsa loquitur* [12] are established, negligence *may be inferred* from the injurious occurrence without the aid of circumstances pointing to the responsible cause. The burden of producing further evidence (going forward with proof), but not the ultimate burden of persuasion,[13] is then shifted to the defendant.[14]

■ *Whether a case is fit for the application of res ipsa loquitur presents a question of law.* It is a judicial function to determine if a given inference may be drawn from a proffered set of circumstances.[15] When, at the close of the plaintiff's case the evidence does not demonstrate a sufficient balance of probabilities in favor of negligence,[16] or the issue still rests on conjecture,[17] submission on *res ipsa loquitur* consideration is not the plaintiff's due.

■ The effect of the *res ipsa loquitur* evidentiary rule is merely to raise a

See also *Wiles v. Myerly*, 210 N.W.2d 619, 624 (Iowa 1973); *Arterburn v. St. Joseph Hospital & Rehabilitation Center*, 220 Kan. 57, 551 P.2d 886, 893–94 (1976); *Richards v. Daniels*, 430 So.2d 779, 781 (La.App.1983); *Corbett v. Curtis*, 225 A.2d 402, 405 (Me.1967); *Swan v. Tygett*, 669 S.W.2d 590, 591–92 (Mo.App.1984); Prosser, The Procedural Effect of *Res Ipsa Loquitur*, 20 Minn.L.Rev. 241, 257–258 (1936).

**10.** *Qualls v. U.S. Elevator Corp.*, 1993 OK 135, 863 P.2d 457, 460; *Thompson v. Presbyterian Hospital, Inc.*, 1982 OK 87, 652 P.2d 260, 265. See, e.g., *Jackson, supra* note 5 at 771.

**11.** *Turney v. Anspaugh*, 1978 OK 101, 581 P.2d 1301, 1304; *St. John's Hospital & School of Nursing, Inc. v. Chapman*, 1967 OK 126, 434 P.2d 160, 162 (syl. 1), 166–167.

**12.** The *foundation facts* to be shown are: (a) an injury that does not occur in the usual course of everyday conduct; (b) the defendant exclusively controlled the instrumentality that caused the injury; (c) evidence of the true explanation for the harm's occurrence is more accessible to the defendant than to the plaintiff; and (d) the circumstances surrounding the harmful event are not likely to produce an injury unless the defendant fails to exercise due care to prevent its occurrence. *Jackson, supra* note 5 at 770 n. 17; *Qualls, supra* note 10 at 460; *Thompson, supra* note 10 at 265; *Turney, supra* note 11 at 1304; *Martin v. Stratton*, 1973 OK 124, 515 P.2d 1366, 1370; *Holland v. Stacy*, 1972 OK 69, 496 P.2d 1180, 1183; *St. John's, supra* note 11 at 166–167.

**13.** For many years the phrase "burden of proof" was ambiguous, because the term was used to describe two distinct concepts. Burden of proof was frequently used to refer to what is now called the burden of persuasion—the notion that if the evidence is evenly balanced, the party that bears the burden of persuasion must lose. But the phrase was also used to refer to what is now called the burden of production—a party's obligation to come forward with evidence to support its claim. *Director, OWCP v. Greenwich Collier-*

*ies*, 512 U.S. 267, 271–272, 114 S.Ct. 2251, 2255–2256, 129 L.Ed.2d 221 (1994) (citing J. Thayer, Evidence at the Common Law 355–384 (1898)) (detailing various uses of the term burden of proof among 19th–century English and American courts). In 1923 the Supreme Court of the United States noted that the distinction between "the burden of proof" and "the necessity of producing evidence to meet that already produced … is now very generally accepted, although often blurred by careless speech." *Hill v. Smith*, 260 U.S. 592, 594, 43 S.Ct. 219, 219–20, 67 L.Ed. 419 (1923). In the two decades after *Hill*, U.S. Supreme Court jurisprudence consistently distinguished between *burden of proof*, which it defined as burden of persuasion, and *burden of production* (or the burden of going forward with the evidence). *Greenwich, supra*, 512 U.S. at 274, 114 S.Ct. at 2256. During the same period federal circuit jurisprudence also limited the meaning of burden of proof to burden of persuasion, and explicitly distinguished this concept from the burden of production. *Greenwich, supra*, 512 U.S. at 275, 114 S.Ct. at 2256, n. * * * (citing *Lee v. State Bank & Trust Co.*, 38 F.2d 45, 48 (2d Cir.1930); *Commissioner v. Bain Peanut Co.*, 134 F.2d 853, 860, n. 2 (5th Cir.1943)).

**14.** *Thompson, supra* note 10 at 265; *Turney, supra* note 11 at 1304.

**15.** *Qualls, supra* note 10 at 460; *Thompson, supra* note 10 at 266; *Turney, supra* note 11 at 1304; *Little v. Arbuckle Memorial Hosp. Bd. of Control*, 1983 OK CIV APP 28, 665 P.2d 1227, 1228–29 (in determining whether the plaintiff is entitled to a *res ipsa* instruction as a matter of law, the trial court should look only to the plaintiff's evidence).

**16.** *Qualls, supra* note 10 at 460; *Thompson, supra* note 10 at 266; *Turney, supra* note 11 at 1304.

**17.** *Avard v. Leming*, 1994 OK 121, 889 P.2d 262, 266.

rebuttable inference which allows a plaintiff to take the case to the jury and thus avoid a directed verdict for the defendant.[18] Where the *proof is conflicting or subject to different inferences*, some of which are in favor of and others against the applicability of *res ipsa loquitur*, the question must be left to the jury.[19] It is only when one of the foundation facts *is irrefutably negated* [20] that the necessary prop may be deemed knocked out from under the *sine qua non* predicate for application of the *res ipsa* proof pattern.

## Application Of Res Ipsa Loquitur In The Context Of Health–Care Litigation

▆▆▆▆ A hospital has the duty to provide for the care and protection of its patients, and in the performance of this duty the hospital is required to exercise such rea-

sonable care as the patient's known condition requires.[21] *Vis-a-vis* its resident, a nursing home stands in a relationship similar to that which a hospital occupies opposite its patient. A resident is under the control and in the care of an entity to which his (or her) safety is entrusted. A nursing home has a duty to provide care at a reasonable standard, taking into consideration the resident's known mental and physical condition.[22] In the context of health-care litigation, *res ipsa loquitur*—which is applicable to actions against physicians and hospitals [23]—may, *upon proof of the foundation elements*, also be followed in lawsuits against nursing homes.[24] Negligence can never be *presumed* from showing no more than the happening of the harmful event.[25]

▆▆▆▆ It is unnecessary to analyze this cause in terms of our medical-malpractice

**18.** Proof of the harmful occurrence and of attendant circumstances permits an inference of defendant's negligence, which, though rebuttable, cannot be disregarded by the triers of fact, but must be weighed against the evidence adduced by the defendant. *Qualls, supra* note 10 at 460; *Fruechting v. Gilley*, 1953 OK 217, 259 P.2d 530, 533; *Maybach v. Falstaff Brewing Corp.*, 359 Mo. 446, 222 S.W.2d 87, 90 (1949).

**19.** It becomes the jury's function, not that of the trial court, to weigh conflicting evidence and ultimately to choose whether the inference of the defendant's negligence is to be preferred over other competing inferences that are permissible. *Kambat v. St. Francis Hosp.*, 89 N.Y.2d 489, 655 N.Y.S.2d 844, 846, 678 N.E.2d 456, 458 (1997); *Dover Elevator Co. v. Swann*, 334 Md. 231, 638 A.2d 762, 765 (1994); *Carlos v. MTL, Inc.*, 77 Hawai'i 269, 883 P.2d 691, 702 (App.1994); *Holman v. Ford Motor Co.*, 239 So.2d 40, 45 (Fla. App.1970); *Seneris v. Haas*, 45 Cal.2d 811, 291 P.2d 915, 924 (1956).

**20.** Irrefutable negation may operate to so discredit plaintiff's proof (or one of its critical elements) as to bring the defendant's probative showing into the realm of undisputed evidence that is supportive of but a single inference (with no opposite inferences left to favor the refuted plaintiff's proof).

**21.** The degree of care the hospital owes its patients is commensurate to and consistent with their physical or mental debility. *Sutherland v. Saint Francis Hospital, Inc.*, 1979 OK 18, 595 P.2d 780, 784; *St. John's, supra* note 11 at 169.

**22.** In other jurisdictions the standard of patient care owed by the hospital has been applied in favor of nursing home residents. Nursing

homes, like private hospitals, are under a duty of exercising reasonable care to avoid injury to residents. The reasonableness of care is to be assessed in the light of the patient's physical and mental condition. *Virginia S. v. Salt Lake Care Center*, 741 P.2d 969, 972 (Utah App.1987); *Lemoine v. Ins. Co. of North America*, 499 So.2d 1004, 1007 (La.App.1986); *Murphy v. Allstate Ins. Co.*, 295 So.2d 29, 34–35 (La.App.1974), cert. den. 299 So.2d 787 (La.1974) (the same general rules apply to nursing homes as to hospitals in defining the degree of care owed to patients); *Juhnke v. Evangelical Lutheran Good Samaritan Soc.*, 6 Kan.App.2d 744, 634 P.2d 1132, 1136 (1981); *MacAlpine v. Martin*, 205 So.2d 347, 349 (Fla.App.1967); *Nichols v. Green Acres Rest Home*, 245 So.2d 544, 545 (La.App.1971); *Golden Villa Nursing Home, Inc., v. Smith*, 674 S.W.2d 343, 348 (Tex.App.1984); *Annot., Patient Tort Liability of Nursing Homes*, 83 A.L.R.3d 871, 875 (1978).

**23.** *St. John's, supra* note 11 at 168–169; *Turney, supra* note 11 at 1304. *St. John's* overruled extant jurisprudence holding *res ipsa loquitur* inapplicable to medical malpractice suits. *See Cooper v. McMurry*, 194 Okl. 241, 149 P.2d 330 syl. 2 (1944); *Hembree v. Von Keller*, 189 Okl. 439, 119 P.2d 74, 78 (1941).

**24.** *Virginia, supra* note 22 at 972; *McCartney v. Columbia Heights Nursing Home, Inc.*, 634 So.2d 927, 936 (La.App.1994); *Maly v. Arbor Manor, Inc.*, 225 Neb. 276, 404 N.W.2d 419, 422 (1987); *Franklin v. Collins Chapel Connectional Hospital*, 696 S.W.2d 16, 18 (Tenn.App.1985).

**25.** *St. John's, supra* note 11 at 168; *Turney, supra* note 11 at 1304.

*legislation,* 76 O.S.1991 § 21,[26] whose provisions raise "a presumption of *negligence.*"[27] Harder's proof clearly met the *common-law parameters* of the *res ipsa* rule. No more is required by statute than by the common law *to bring* a case within the purview of *res ipsa loquitur* rule.[28]

## IV

## DIRECTED VERDICT PROCESS ANALYZED AND ASSESSED IN THE CONTEXT OF THE INVOKED *RES IPSA LOQUITUR* PATTERN OF PROOF

To establish prima facie a case for *res ipsa* application, Harder was required to show that (1) an *overdose* of the *wrong* prescription medication is not usually ingested in the course of administering prescription drugs to residents; (2) the nursing home has exclusive control and management of the instrumentality (prescription drugs) that caused the injury; (3) evidence shedding light on the harmful event is more accessible to the nursing home than to the plaintiff; and (4) the administration of the injurious overdose is the sort of occurrence which, in the ordinary course of events, would not have happened if one having control of the instrumentality exercised due care.

 The foundation facts can be established by expert testimony or by demonstrating that the defendant's substandard conduct falls within the realm of common knowledge.[29] If the showing of any foundation fact requires a degree of knowledge or skill not possessed by the average person, expert testimony must be adduced.[30]

### A.

### *Foundation Fact I—The Injury Does Not Occur In The Ordinary Course of Operations*

 The first foundation fact requires a showing that the injury—an *overdose of the wrong prescription*—does not occur in the ordinary course of operations at the nursing home.[31]

Jackie Dixon, a licensed practising nurse (and a medication clerk at the Center), testified that residents' prescription drugs are stored at the nurse's station. She gave a detailed account of the method used for dispensing prescribed medication to the residents. *Heritage residents have no access to prescription drugs except when they are administered to them by authorized personnel*—a registered or licensed practising nurse or a certified medication aide. When medication is to be administered, the correct dosage is removed from the storage site and placed in a cart that is pushed down the halls. The nurse (or certified medication aide) removes the medication from its container, places it in a cup, and then serves it to the resident. The cart is kept locked

---

**26.** The terms of 76 O.S.1991 § 21 provide in pertinent part:

"In any action arising from negligence in the rendering of medical care, *a presumption of negligence shall arise* if the following foundation facts are first established:
1. The plaintiff sustained any injury;
2. Said injury was proximately caused by an instrumentality solely within the control of the defendant or defendants; and
3. Such injury does not ordinarily occur under the circumstances absent negligence on the part of the defendant. * * *" (Emphasis supplied.)

**27.** After *St. John's, supra* note 11, was promulgated, the legislature enacted a *statutory presumption of negligence* for certain medical malpractice suits. *See* Okl.Sess.L.1976, Ch. 44, § 5, effective April 8, 1976 (76 O.S.1991 § 21). For extant jurisprudence construing § 21, see *Middlebrook v. Imler, Tenny & Kugler, M.D.'s, Inc.,* 1985 OK 66, 713 P.2d 572, 578; *Fleming v. Baptist General Convention of Oklahoma,* 1987

OK 54, 742 P.2d 1087, 1092; *Sisson By and Through Allen v. Elkins,* 1990 OK 123, 801 P.2d 722, 724–25.

**28.** *See in this connection Jackson, supra* note 5 at 771.

**29.** *Delk v. Gill,* 1969 OK 198, 462 P.2d 530, 532; *Sisson, supra* note 27 at 724. *See also Bardessono v. Michels,* 3 Cal.3d 780, 91 Cal.Rptr. 760, 478 P.2d 480, 488 (1970).

**30.** In *medical malpractice* cases, a physician's negligence *must ordinarily be established* by expert medical testimony. When a physician's lack of care is so grossly apparent that laymen would have no difficulty in recognizing it, expert medical testimony is not required to establish deficient care. *Turney, supra* note 11 at 1307; *Boxberger v. Martin,* 1976 OK 78, 552 P.2d 370, 373.

**31.** *Jackson, supra* note 5 at 771; *Qualls, supra* note 10 at 460; *Thompson, supra* note 10 at 265; *Turney, supra* note 11 at 1304.

while the nurse or aide is administering the medication. Dr. Hays—Kayser's family physician since 1973 (as well as Heritage's medical director)—testified that the administration of the wrong prescription drug in an amount that would cause harm is below the applicable standard of care.

The *first res ipsa* element is met by the evidence adduced because, under the applicable standard of care, the overdose of a wrong prescription drug would not occur in the ordinary course of operations at the defendant nursing home.

### B.

*Foundation Fact II—The Nursing Home Has Exclusive Control Of The Harm–Dealing Instrumentality*

 The *second res ipsa* element is satisfied by proof that the agency or instrumentality causing the injury was under the defendant's *exclusive* control or management at the time the negligence inferable from the type of accident occurred.[32] Exclusive control is a flexible concept[33] which denotes no more than elimination, within reason, of all explanations for the genesis of the injurious event other than the defendant's negligence[34]—a showing that defendant's negligence *probably* caused the accident.[35] The nature and degree of control must be such that the reasonable probabilities point to the nursing home and support an inference that it was the negligent party.[36] Prima facie satisfaction of the control element requires only *reasonably supportive* evidence.[37]

 Janis Raab, the nursing home administrator, testified that Kayser was at the nursing home on September 30, 1992, the day

---

**32.** *Qualls, supra* note 10 at 460–61; *St. John's, supra* note 11 at 169.

**33.** *Oliver v. Hutson,* 596 S.W.2d 628, 630 (Tex. Civ.App.1980); *Vogler v. Dominguez, M.D.,* 624 N.E.2d 56, 61–62 (Ind.App.1993) (*exclusive* control is an "expansive concept which focuses upon who has the right or power to control and the opportunity to exercise it;" the element is satisfied if the defendant had control at the time of the alleged negligence).

**34.** *Qualls, supra* note 10 at 462; *Dermatossian v. N.Y. City Transit Authority,* 67 N.Y.2d 219, 501 N.Y.S.2d 784, 492 N.E.2d 1200, 1205 (1986). *See also Corcoran v. Banner Super Market, Inc.,* 19 N.Y.2d 425, 280 N.Y.S.2d 385, 227 N.E.2d 304, 306 (1967). The *possibility of other causes does not have to be completely eliminated,* but their likelihood must be so reduced that the jury can reasonably find by a preponderance of the evidence that the negligence, if any, lies at the defendant's door. Prosser & Keeton define the burden of exclusivity as follows:
"[I]n proving the element of exclusive control, the plaintiff is not required to eliminate with certainty all other possible causes and inferences, but must show either that the injury can be traced to a specific instrumentality or cause for which the defendant was responsible, or that the defendant was responsible for all reasonably probable causes to which the accident could be attributed." (Citation omitted.) W. Page Keeton et al, PROSSER & KEETON ON THE LAW OF TORTS § 39, at 248–49 (5th ed.1984).
*Seneris, supra* note 19 at 923–24 (citing Prosser, *Res Ipsa Loquitur* in California, 37 Cal.L.Rev. 183, 197–98 (1949)). *The exclusive control element focuses on who has the right, duty or power*

to control and the opportunity to exercise it. *Vogler, supra* note 33 at 61–62.

**35.** *Qualls, supra* note 10 at 462. This court's flexible interpretation of the exclusive-control requirement is consistent with mainstream American jurisprudence. *See, e.g., Ballow v. Monroe,* 699 P.2d 719, 721 (Utah 1985); *Tompkins v. Northwestern Union Trust Co.,* 198 Mont. 170, 645 P.2d 402, 406 (1982); *Parrillo v. Giroux Co.,* 426 A.2d 1313, 1319–20 (R.I.1981); *Gilbert v. Korvette, Inc.,* 457 Pa. 602, 327 A.2d 94, 101–02 (1974); PROSSER & KEETON, *supra* note 34, p. 251 n. 98 (1984).

**36.** *Oliver, supra* note 33 at 630. The purpose of requiring the defendant's control is to provide the basis for an inference that whatever negligence was involved may be charged to the defendant. *Giles v. City of New Haven,* 228 Conn. 441, 636 A.2d 1335, 1339 (1994); *Hoven, supra* note 9 at 384; *Zentz v. Coca Cola Bottling Co.,* 39 Cal.2d 436, 247 P.2d 344, 348 (1952). Exclusive control of the injury-causing instrumentality may be established where the evidence shows that the injury could be traced to a cause for which the defendant was responsible. *Pedersen v. White–Evans Elevator Co., Inc.,* 511 N.E.2d 460, 463 (Ind.App.1987); PROSSER & KEETON, *supra* note 34, § 39, at 248–49.

**37.** *Qualls, supra* note 10 at 460 (whether the *control element is satisfied presents a question for the trier of fact*); *Gentles v. Lanctot,* 145 Vt. 396, 491 A.2d 336, 337 (1985); *Furr v. McGrath,* 1959 OK 34, 340 P.2d 243, 250. *See also Kusy v. K–Mart Apparel Fashion Corp.,* 681 P.2d 1232, 1235 (Utah 1984); *Virginia, supra* note 22 at 971; *Seneris, supra* note 19 at 924.

she ingested an overdose of Tolbutamide. She stated that Heritage was on that day responsible for Kayser's care. This includes the supervision and administration of prescribed medication. Dr. Hays gave testimony that the Mayo Clinic report indicates the drug Kayser ingested on September 30, 1992 was *Tolbutamide* (also known as Orinase), a prescription for diabetes. Although Dr. Hays had not ordered any diabetes medication for Kayser since her admittance to Heritage in July 1992, he had in 1987 given her a prescription for *Tolinase*, a different hypoglycemic medication for a mild, adult-onset diabetic condition.

The September 29, 1992 "nurses notes" indicate that when Kayser had complained of pain, she was given a placebo injection of sterile water. Later that day she received some Tylenol tablets. She was given another placebo injection for pain on September 30. That evening she was transferred to the Clinton Regional Hospital and admitted there while in an unconscious state. Dr. Hays, who attended her in the emergency room, diagnosed the condition as hypoglycemia. While she was hospitalized there, an intravenous device was inserted in the top of her right foot to treat the coma. She was later transferred to Presbyterian Hospital, where she showed signs of ecchymosis [38] on top of the right foot. This condition ultimately developed into gangrene and required an above-the-knee amputation of her right leg. Kayser's medical records at Heritage did not indicate that she had exhibited any hypoglycemia symptoms until the evening of September 30. According to Dr. Ellis' review of the medical records, *Kayser ingested the medication while a resident at the home.* Dr. Davis, the endocrinologist who treated Kayser at Presbyterian Hospital, opined that *Kayser must have ingested a large dosage of Tolbutamide because 72 hours later it was still in her system.*

Harder argues she has established the element of *exclusive control* by showing that (a) Kayser's injury can be traced to the ingestion of an overdose of Tolbutamide, a diabetic medication, (b) Heritage was responsible for supervising and administering prescription drugs to its residents, and (c) Kayser was in the nursing home's care and control when she ingested Tolbutamide.

Heritage counters that there is *no evidence* of its exclusive control over Tolbutamide or over Kayser's ability to obtain (or ingest) that medication. Neither is there evidence, Heritage urges, as to the source of the Tolbutamide. The nursing home's computer records do not list the medication as one prescribed for any resident. According to Heritage, Kayser was mentally and physically capable of obtaining drugs from a source other than the Center. We are directed to testimony that (a) Kayser was ambulatory and could take care of routine day-to-day functions, (b) she was oriented as to time and place, (c) her comprehension was quick, (d) she was independent as far as her nutrition was concerned, (e) she had frequent visits from her sisters and a brother-in-law, (f) two weeks before the critical event, she stayed at her sister's (Harder's) house for three days, and (g) at the time of Kayser's visit, Harder was taking Micronase, a diabetic medication. Because Kayser had become addicted to prescription drugs and was a known drug seeker, Heritage argues, she could have gained access to hypoglycemia medication from her sister, a third party, or from one of her old prescription containers still stored at her sister's house. Heritage argues *there is no evidence* that one of its employees administered the diabetic drug. According to Heritage, Harder's evidence establishes no more than Kayser's presence at the nursing home at the time she ingested the medication. From this, Heritage urges, the jury would be left to speculate as to the source of the ingested Tolbutamide. An inference, Heritage argues, cannot supply the necessary foundation fact.[39]

Harder counters that the computer printout does not contain a complete list of all prescription medications then on the premises. There is proof, she urges, that the Center's computer database includes only those drugs which are in current and continuous

---

38. According to Dr. Hays ecchymosis is "blood oozing through the tissues."

39. Heritage relies on *Sisson, supra* note 27 at 725 and *Avard, supra* note 17.

patient use. It does not encompass drugs for short-term administration or any medication a resident may bring into the home when initially admitted there. According to Harder's proof, *it is not until a physician directs the nursing home to refill the prescription that it is entered into the computer database.*

On review of assigned error in the trial court's directed verdict for a defendant, our scrutiny is confined to the evidence favorable to the plaintiff together with all reasonable inferences that may be drawn from that proof. We must disregard conflicting proof or contrary inferences.[40] The plaintiff established that (1) the offending drug was prescribed medicine; (2) the administration of prescription drugs to the residents is within the control of the defendant, and (3) at the time of the harmful event, the decedent, a Heritage resident, was at the nursing home and subject to the policies that govern there the distribution and administration of prescribed medicine. *This constitutes a legally sufficient showing to satisfy the control-element requirement for the res ipsa loquitur pattern of proof.*[41]

It was not fatal to the plaintiff's case that she failed to *refute* the defendant's proof of Tolbutamide's absence from the computer list of prescribed drugs present in the distribution pool on the critical day the drug was ingested. Nor was the plaintiff under a duty to show that the particular drug alleged to have been responsible for the decedent's harm was on any other resident's list of medication to be administered. The offending drug's absence from the drug bank list shown in the computer *is the defendant's*

refutational evidence which the trial court was bound to leave out of its analysis when passing on the Center's challenge to the sufficiency of the evidence for submission of plaintiff's case to the jury.

### C.

### Foundation Fact III—True Explanation For The Harm's Occurrence Is More Accessible to the Nursing Home

The *third res ipsa* element consists of evidence that the precise cause of the accident is more accessible to the defendant than to the plaintiff.[42]

■ Heritage is required to chart and keep in its records extensive data about each resident's health, medical history, physician orders and overall medical treatment. Its records also contain information about the prescribed medication that is ordered, received, stored on its premises and administered to its residents.

The evidence adduced clearly demonstrates that information about the circumstances surrounding the administration to Kayser of excessive dosage of the wrong prescription is more accessible to the nursing home than to Kayser.

### D

### Foundation Fact IV—The Defendant's Negligence

■ The *fourth res ipsa* element required Harder to present reasonably supportive evidence that an overdose of a wrong prescription would not ordinarily occur ab-

---

**40.** *Fleming, supra* note 6 at 1091–92; *Condo, supra* note 6 at 51; *Hanson, supra* note 6 at 995; *Sisler supra* note 6 at 503; *Price, supra* note 6 at 244.

**41.** Harder's proof of the Center's *control* over the injurious medication is the probative *res ipsa* component that was patently lacking in *Avard, supra* note 17, the case on which the Center most strongly relies in its efforts to show that there was no error in the trial court's directed verdict for the defendant. In *Avard,* the genesis of the injurious instrumentality—a sliver of glass (in the homeowner-defendant's carpet) which injured a babysitter—was in doubt. Moreover, the standard of duty owed by a homeowner to an invitee is considerably lower than the degree of care to

be expected of a nursing home *vis-a-vis* its resident. See, *e.g., Sutherland, supra* note 21.

**42.** *Qualls, supra* note 10 at 461 n. 12 (quoting 9 Wigmore, EVIDENCE § 2509, p. 382 (3d ed.)):

"[T]he particular force ... of [res ipsa], regarded as a presumption throwing upon the party charged the duty of producing evidence, consists in the circumstance that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to [the defendant] but inaccessible to the injured person." (Emphasis added.)

*See also St. John's, supra* note 11 at 166. The doctrine's *raison d'etre* is that the circumstances surrounding the case are peculiarly within the knowledge of the defendant and are unavailable to plaintiff. *Faulkner v. Pezeshki,* 44 Ohio App.2d 186, 337 N.E.2d 158, 164 (1975).

sent negligence on the part of someone who had the instrumentality in its exclusive control and management. It need not be shown that *negligence is the only* explanation for the injury, but merely the most probable one. This element is satisfied if, under the facts of the case, common experience indicates that *the injury was more likely than not the result of the defendant's negligence.*[43]

In light of the circumstances that surround the injurious event, and disregarding, as we must, the defendant's conflicting (refutational) evidence, it seems reasonably clear that Kayser's ingestion of a Tolbutamide overdose would not have taken place in the absence of negligence by the nursing home's responsible staff. The record shows that Kayser had not been prescribed any diabetes medication while a resident at Heritage and that she had never been prescribed that type of hypoglycemic drug. It is uncontradicted that Kayser was at the nursing home when she ingested the prescribed medication. There is no direct evidence that anyone else supplied to her the harm-dealing dosage or that the substance in question was kept in her room (or elsewhere within her control). Neither is there indication that any other cause contributed to the coma. According to Jackie Dixon, a LPN at the Center, the nursing home is responsible for the administration of medication to its residents. As Dr. Hays testified, the administration of the wrong medication in an amount so excessive as to harm a resident would be below the applicable professional standard of care.

In sum, Harder's evidence laid before the trial court the requisite *res ipsa* foundation facts from which the trier may infer that the injury—from an *overdose* of the *wrong* prescription—was one that would *not ordinarily occur* in the course of controlled supervision and administration of prescribed medicine in the absence of negligence on the Center's part. Because *nothing* in the record irrefutably *negates* any of the critical elements for application of *res ipsa loquitur,* Harder clearly met her probative initiative by establishing the necessary components for *invoking the rule. The responsibility for producing proof that would rebut the inferences*

*favorable to Harder's legal position thus came to be shifted to the defendant.* The plaintiff was clearly entitled to have her case go to the jury—under the aid of a *res ipsa* instruction—for resolution of the disputed issues.

### SUMMARY

By the evidence adduced at trial Harder met the standards for submission of her claim with the aid of *res ipsa loquitur* pattern of proof. *It is for the trier of fact to choose between the favorable inferences to be drawn from the pattern of proof she invoked and the defendant's refutational evidence.* We hold that the trial court erred *by directing a verdict for Heritage at the close of Harder's case.*

On certiorari granted upon the plaintiff's petition, the Court of Civil Appeals' opinion is vacated, the trial court's judgment (on directed verdict) is reversed and the cause is remanded for further proceedings to be consistent with today's pronouncement.

KAUGER, C.J., SUMMERS, V.C.J., and HODGES, LAVENDER, HARGRAVE, ALMA WILSON and WATT, JJ., concur.

SIMMS, J., dissents.

---

**43.** *Flick v. Crouch,* 1976 OK 116, 555 P.2d 1274, 1277; *Boxberger, supra* note 30 at 374; *St John's, supra* note 11 at 166; *see also Seneris, supra* note 19 at 923.