2006 OK 83

Lowonna JONES, Individually and as the Personal Representative of the Estate of Christopher Williams Jr., her deceased adult son, Plaintiff/Appellant,

v.

MERCY HEALTH CENTER, INC.; Phoenix Physicians Services, Inc.; Jeffery Johns, ARNP; Conrad Caldwell, M.D.; and Timothy Hill, M.D., Defendants/Appellees,

and

James C. Robbins, RN, Defendant.

No. 102,192.

Supreme Court of Oklahoma.

Nov. 7, 2006.

As Modified on Denial of Rehearing Feb. 20, 2007.

James M. Barber and Robert J. Haupt, Haupt Brooks Vandruff Cloar, PLLC, Oklahoma City, OK, for Plaintiff/Appellant.

Michael J. Heron, Heron, Sweet, Fox & Trout, P.C., Oklahoma City, OK, for Defendant/Appellee Mercy Health Center, Inc.

Robert C. Margo, L. Earl Ogletree, and Kristi L. Hazen, Short Wiggins Margo & Butts, Oklahoma City, OK, for Defendants/Appellees Phoenix Physicians Services, Inc.; Conrad Caldwell, M.D.; and Timothy Hill, M.D.

Kevin Driskill, Driskill & Jones, Oklahoma City, OK, for Defendant/ Appellee Jeffrey Johns, ARNP.

COLBERT, J.

¶ 1 Plaintiff Lowonna Jones petitioned this Court for a writ of certiorari to review the Court of Civil Appeals' opinion affirming the district court's summary judgment in her action for medical malpractice against Defendants Mercy Health Center, Inc.; Phoenix Physicians Services, Inc.; Jeffery Johns, ARNP; Conrad Caldwell, M.D.; and Timothy Hill, M.D. The single issue is whether the evidentiary materials are legally sufficient to create a dispute of the material fact of causation. Because they were sufficient, summary judgment was in error. We vacate the Court of Civil Appeals' opinion, reverse the district court's judgment, and remand for further proceedings.

## BACKGROUND AND PROCEDURAL HISTORY

¶ 2 At 2:00 p.m. on May 11, 2003, 20–year-old Christopher Williams entered the emergency room at Mercy Health Center complaining of significant abdominal pain and constipation. His pulse rate and white blood cell count were elevated and x-rays showed the presence of a large amount of stool in his colon. Williams was treated by Nurse Practitioner Johns, who was supervised by Dr. Caldwell and Dr. Hill. Nurse Practitioner Johns diagnosed Williams with a fecal impaction and prescribed an enema. Williams left Mercy Health Center approximately five hours after he arrived.

¶ 3 Less than an hour after he left Mercy Health Center, Williams arrived at the Edmond Medical Center emergency room. He was in shock, his abdomen was distended, and he was in critical condition as he walked in to the hospital. His condition was described in hospital records as "a true surgical emergency with a guarded prognosis." He was rushed to surgery to relieve the pressure on his colon but died before the surgery could be completed.

¶ 4 Plaintiff, Williams' mother, sued Mercy Health Center, Nurse Practitioner Johns, Dr. Caldwell, Dr. Hill, and Phoenix Physicians Services in her own capacity and as the personal representative of Williams' estate for negligence and wrongful death on theories of medical malpractice, negligent supervision, and respondeat superior.[1] Defendants filed motions for summary judgment

---

1. Plaintiff also named James C. Robbins, RN, as a defendant, but later dismissed him from the lawsuit.

arguing that Plaintiff could not establish that Defendants' actions caused Williams' death from cardiac arrest.[2] The district court agreed and granted summary judgment. The Court of Civil Appeals affirmed.

## STANDARD OF REVIEW

¶ 5 We will affirm a summary judgment only if the moving parties have established that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law. *Brown v. Alliance Real Estate Group*, 1999 OK 7, ¶ 7, 976 P.2d 1043, 1045. In considering whether to grant summary judgment, the trial court may consider evidentiary materials such as depositions, affidavits, admissions, answers to interrogatories, and documentary evidence submitted by the parties. *See Akin v. Mo. Pac. R.R.*, 1998 OK 102, ¶ 8, 977 P.2d 1040, 1043–44; *see also* Rule 13 of the Rules for Dist. Cts. of Okla., Okla. Stat. tit. 12, ch. 2, app. 1 (Supp.2005). A defendant can obtain summary judgment by establishing that all of the uncontested facts *and* all of the reasonable inferences to be drawn from the uncontested facts compel the conclusion that one essential element of the plaintiff's claim is lacking. *Akin*, 1998 OK 102, ¶ 9, 977 P.2d at 1044.

¶ 6 In this case, Defendants artfully convinced the trial court that, since her experts failed to use certain "magic words," Plaintiff could not establish the essential element of causation. A summary judgment for lack of causation is appropriate only if the "trial court determines that the facts are insufficient to show cause in fact because a reasonable person could not believe in the existence of the causal link between the injury and facts relating to a defendant's conduct." *Christian v. Gray*, 2003 OK 10, ¶ 50, 65 P.3d 591, 611. That determination is one of law because it is an objective standard— "what a reasonable person believes." *Id.* A trial court should not grant summary judgment if "reasonable minds could draw differ-

ent inferences or conclusions from the facts." *Alliance*, 1999 OK 7, ¶ 7, 976 P.2d at 1045.

## DISCUSSION

¶ 7 On the day he died, Christopher Williams was 20 years old and athletic. He was generally healthy and had no medical issues other than the condition that brought him to Mercy Health Center. He came to Mercy Health Center at 2 o'clock that afternoon complaining of severe abdominal pain and constipation persisting for three days. He rated his pain level as 8 out of a possible 10 and reported a history of constipation and bowel impactions.

¶ 8 When Williams' vital signs were taken for the first and only time at Mercy Health Center, he had an elevated pulse rate, blood tests showed signs of dehydration and an elevated white blood cell count, and x-rays showed a significant amount of stool in his colon. Nurse Practitioner Johns prescribed a "milk and molasses" enema, which was administered by a nurse. Mercy Health Center's records do not reflect the amount of enema administered and state only that Williams had several large bowel movements without making further evaluation. Further, the records indicate that Williams was not examined again during the five hours he remained there. Williams left at 7:10 p.m., after he had received verbal discharge instructions. Although he had not yet received written discharge instructions and a prescription for stool softener, Williams' aunt, who accompanied him to Mercy Health Center, stated that Williams believed he had been discharged at that point. Although Nurse Practitioner Johns testified that Williams left before he was released, there is nothing in Mercy Health Center's records to indicate that Williams left against medical advice.

¶ 9 At 8:04 p.m., less than an hour after he left Mercy Health Center, Williams sought help at Edmond Medical Center. In contrast to the cursory records from Mercy Health Center, the Edmond Medical Center records

---

**2.** Although Defendants filed separate motions for summary judgment, their legal posture, evidentiary material, and legal authority were very similar. We, therefore, will refer to Defendants in the aggregate unless our legal analysis or description of the evidentiary material requires a more specific reference.

indicate that Williams' condition was immediately viewed with grave concern. His respiration was shallow, his blood oxygen level and blood pressure were low, he appeared "in extremis" and short of breath, and his extremities were mottled. The records describe Williams' abdomen as "grossly distended and tympanitic and very tender," appearing "approximately the size of an 8 months pregnancy." A rectal exam "[r]eveal[ed] fecal impaction, although he was stooling at the time he was entering the Emergency Room." He was diagnosed as "a true surgical emergency with a guarded prognosis" and rushed to the operating room.

¶ 10 Once Williams was in surgery, the surgeon found a "marked distended sigmoid colon." When the surgeon opened Williams' colon, "feces spewed violently to the ceiling of the operating room and cover[ed] much of the operating room." After the pressure in Williams' colon was released, his vital signs improved slightly for a few minutes, but his blood pressure remained critically low. The surgical team administered "massive amounts of fluid" while they continued the operation. As the operation neared its conclusion, Williams "developed [a] very brief episode of ventricular tachycardia and went into cardiac arrest."[3] The surgical team could not resuscitate Williams and he was pronounced dead at 11:49 p.m., less than ten hours after he first sought treatment at Mercy Health Center.

¶ 11 The autopsy report listed the cause of Williams' death as "Constipation secondary to intestinal obstruction, with megacolon, megarectum and fecal impaction." The physician performing the autopsy commented that Williams "had an unfortunate outcome secondary to fecal impaction and intestinal obstruction *compromising his hemodynamic status and leading to death.*"[4] (Emphasis added.)

¶ 12 Medical malpractice claims are based on the tort theory of negligence. To establish a claim of negligence, a plaintiff must submit evidence in support of three elements: first, that the defendant had a duty to protect the plaintiff from injury; second, that the defendant failed to properly exercise or perform that duty, and third, that the defendant's failure to properly exercise or perform that duty caused the plaintiff's injury. *Akin,* 1998 OK 102, ¶ 36, 977 P.2d at 1054; *see also McKellips v. St. Francis Hosp., Inc.,* 1987 OK 69, ¶ 8, 741 P.2d 467, 470.

¶ 13 Plaintiff presented evidence of the first two elements by presenting three expert witnesses, Daniel J. DeBehnke, M.D., Diane L.S. Hunt, M.D., and Elda Ramirez, R.N.P. (nurse practitioner), who concluded that Defendants' treatment of Williams fell below the appropriate standard of care. They all agreed that Williams' vital signs, blood test results, and x-rays, all taken when he first sought medical attention, indicated a very serious and worsening condition that should have been evaluated and treated more vigorously and monitored more closely. According to Dr. DeBehnke, those vital signs indicated the presence of "a significant intra-abdominal event" and that Williams was probably in the early stages of sepsis or sepsis syndrome.[5]

¶ 14 Plaintiff's experts criticized Defendants' failure to take Williams' vital signs more than once, to record the amount of enema administered to Williams, and to record the amount of stool he produced after receiving the enema. All three concluded that Williams should have received intravenous fluids early in his stay and Dr. DeBehnke and Dr. Hunt stated that he should have had either a CAT scan or a surgical consult. Both doctors agreed that administering an enema to Williams was medically

3. Tachycardia is a "relatively rapid heart action whether physiological (as after exercise) or pathological." Merriam–Webster's Collegiate Dictionary 1271 (11th ed.2003). Cardiac arrest is a "temporary or permanent cessation of the heartbeat." *Id.* at 186.

4. Hemodynamics are "a branch of physiology that deals with the circulation of the blood" or "the forces or mechanisms involved in circulation." *Id.* at 580.

5. Sepsis is "a toxic condition resulting from the spread of bacteria or their toxic products from a focus of infection." *Id.* at 1135; *see also Jackson v. State,* 1971 OK CR 237, ¶ 4, 486 P.2d 765, 766 (septicemia a "generalized infection").

inappropriate because of the risk of further distending or perforating his colon. Dr. Hunt specifically stated that Defendants should have admitted Williams to intensive care and administered intravenous antibiotics.

¶ 15 In their motions for summary judgment, Defendants did not seriously dispute that Plaintiff had presented evidence to create an issue of fact as to the first two elements of negligence. They focused instead on the third element: causation. A plaintiff cannot recover for negligence unless it was the proximate cause of the injuries for which the plaintiff seeks compensation. *Jackson v. Jones*, 1995 OK 131, ¶ 8, 907 P.2d 1067, 1072–73. Proximate cause consists of both cause in fact and legal cause. *McKellips*, 1987 OK 69, ¶ 9, 741 P.2d at 470.

¶ 16 Cause in fact is the threshold "but for" question, *id.* ¶ 11, 741 P.2d at 471, while legal causation is a limiting principal that "requires a determination based on both common sense and policy arguments." *Akin*, 1998 OK 102, ¶ 38 n. 79, 977 P.2d at 1054 n. 79. The existence of proximate cause is generally a question of fact for the jury to determine and becomes a question of law only if there is no evidence from which a reasonable person could find a causal nexus between the defendant's negligent act and the plaintiff's injury. *Jackson*, 1995 OK 131, ¶ 8, 907 P.2d at 1072–73. However, if the facts relevant to causation are disputed or if conflicting inferences can be drawn from the undisputed facts, the determination of causation must be left for the trier of fact. *Id.* ¶ 5, 907 P.2d at 1071–72. Causation need not be established to a degree of absolute certainty. *McKellips*, 1987 OK 69, ¶ 11, 741 P.2d at 471; *see generally Orthopedic Clinic v. Hanson*, 1966 OK 119, ¶ 15, 415 P.2d 991, 995.

¶ 17 Causation in a medical malpractice case must ordinarily be established by expert testimony. *Harder v. F.C. Clinton, Inc.*, 1997 OK 137, ¶ 14 n. 30, 948 P.2d 298, 305 n. 30. Plaintiff first attempted to satisfy the causation element with the report and testimony of Dr. DeBehnke. Dr. DeBehnke was highly critical of the care given to Williams by Defendants. He concluded that

Williams would have "more likely than not" survived if he had received the appropriate care by about 4 o'clock in the afternoon. Dr. DeBehnke would not, however, state that Defendants' failings "caused" Williams' death and indicated that a more definitive answer would have to come from a surgeon.

¶ 18 Plaintiff then introduced the report and testimony of Dr. Hunt. Dr. Hunt was equally critical of the level of care Defendants provided to Williams. Although she admitted that it would be "speculative" to state categorically that Defendants "caused" Williams' death, she stated repeatedly that Defendants "contributed" to Williams' death. Dr. Hunt stated that conditions like Williams' when he walked into Mercy Health Care that afternoon generally resulted in death 20 to 25% of the time, but that the enema reduced his chances of survival to less than 5%:

A. When he presented to Mercy, the— the constellation of abdominal pain, elevated white count with the left shift and his tachycardia indicated that he had at least ischemic colitis, and then an enema wouldn't—would make those symptoms worse.

He may well have been in the early phases of sepsis at his presentation in Mercy, and that's why I strongly believe that additional vital signs and additional evaluation would have had the ability to pick that up before he left.

Q. And had that [been] picked up before he left, is it your opinion that he would not have died later that evening?

* * *

A. He would have at least had a potential of surviving. Toxic megacolon, which was the diagnosis given him on the autopsy, does carry around a 20, 25 percent mortality all comers. He had the advantage of being young and otherwise healthy. But he still would have had a 20, 25 percent risk of mortality had he been treated appropriately.

Q. So a 75 percent chance of survival?

A. Statistically.

¶ 19 Dr. Hunt continued with unequivocal testimony that Defendants should not have administered the enema—an "absolute con-

traindication"—and that, by doing so, Defendants significantly reduced Williams' chances of surviving an already dangerous condition.

Q. [I]f I understand what you're saying, once the enema's given, that then there is no chance of survivability.

A. Well, I don't think there's no chance. There's just not much of a chance.

Q. Less than 5 percent?

A. Probably.

¶ 20 Defendants, the trial court, and the Court of Civil Appeals focused on Plaintiff's experts' refusal to state that Defendants' conduct "caused" Williams' death. Specifically, the Court of Civil Appeals focused on the experts' failure to conclude that Defendants' negligence in failing to diagnose and properly treat Williams' condition specifically caused him to die from cardiac arrest. We have rejected the notion, however, that an expert must speak certain "magic words" before the issue of causation will be allowed to go to the jury. *McKellips,* 1987 OK 69, ¶ 22, 741 P.2d at 474.

¶ 21 First, the assumption that Williams died simply from "cardiac arrest" leads to an overly simplistic analysis. The documents in the summary judgment record state outright or, at a minimum, compel the inference that Williams' heart stopped *because* of the effects of the untreated fecal impaction causing megacolon, megarectum, and widespread infection (sepsis). Indeed, we can see no other reasonable view of the evidentiary materials provided by the parties. For example, although the certificate of death, which was completed by the surgeon, listed the cause of death as "cardiac arrest," it also stated that this was "due to" or "as a consequence of" megacolon. Dr. Hunt testified that conditions like Williams' result in rapid changes in the patient's electrolytes and other blood fluids, while the autopsy report concluded that Williams' heart stopped as a result of the critically low blood pressure and other changes in his blood status, summarizing "this patient ... had ... an unfortunate outcome secondary to fecal impaction and intestinal obstruction compromising his hemodynamic status and leading to death."

¶ 22 It defies common sense and the evidentiary material to infer that Williams' death from "cardiac arrest" was unrelated to the shutdown of his systems *caused* by the fluid imbalances and rampant infection resulting from the fecal impaction, intestinal obstruction, megacolon, and megarectum. To the contrary, it is reasonable to infer that Defendants' failure to appropriately treat Williams' condition in a timely manner and the resulting 5–6 hour delay in proper medical treatment resulted in his ultimate death by cardiac arrest. Indeed, there is no evidence in the record to allow any inference of any other condition causing Williams' heart to stop beating. *See Jackson v. State,* 1971 OK CR 237, ¶ 4, 486 P.2d 765 (where victim suffered extensive injuries as a result of a beating by defendant, his death seven days later was caused by the beating even though the pathologist concluded that the "immediate cause of death was cardiac arrest which was 'a complication of the septicemia or the generalized infection ... in several organs of the body ... arising in this extensive area of injury in the left chest wall.' ").

¶ 23 Certainly, Dr. Hunt cautiously admitted that she would have to "speculate" to say that Defendants' "caused" Williams' death. However, whether causation is so speculative that it is insufficient as a matter of law is a determination for the court, not the expert witness. *See Thompson v. Presbyterian Hosp., Inc.,* 1982 OK 87, ¶ 12, 652 P.2d 260, 263–64. Moreover, Dr. Hunt's uncertainty was exacerbated by Defendants' incomplete medical records. "Health care providers should not be given the benefit of the uncertainty created by their own negligent conduct." *McKellips,* 1987 OK 69, ¶ 23, 741 P.2d at 474.

¶ 24 In evaluating the evidence of causation for purposes of summary judgment, a trial court should view the totality of the evidence and not focus on a single word—"causation"—or a single piece of evidence. Where, as here, the plaintiff has presented evidence leading to the reasonable inference that the injury has resulted from the defendant's conduct and there is a total lack of evidence to support any other reasonable inference, the trial court should deny

summary judgment on the issue of causation. We reiterate that the determination of causation may be removed from the province of the fact-finder *only* when there is a complete lack of evidence and no reasonable inference tending to link the defendant's negligence to the plaintiff's harm. *See generally Johnson v. Hillcrest Health Center, Inc.,* 2003 OK 16, ¶ 16, 70 P.3d 811, 820; *Christian,* 2003 OK 10, ¶ 51, 65 P.3d at 611; *Alliance,* 1999 OK 7, ¶ 7, 976 P.2d at 1045; *Akin,* 1998 OK 102, ¶ 37, 977 P.2d at 1054.

¶ 25 Moreover, even if Plaintiff had not proffered sufficient evidentiary material to avoid summary judgment on the issue of causation under a general analysis, this is precisely the kind of situation contemplated by the doctrine of "loss of chance," adopted by this Court nearly 20 years ago in *McKellips v. Saint Francis Hospital, Inc.,* 1987 OK 69, 741 P.2d 467. The "loss of chance" doctrine applies when "a health care provider deprives a patient of a significant chance for recovery by negligently failing to provide medical treatment." *Id.* ¶ 23, 741 P.2d at 474. "Loss of chance" reallocates the power to decide causation so that a plaintiff can satisfy its burden of producing evidence of causation by showing that the defendant's actions resulted in a substantial decrease in the chance of survival. *Id.* ¶ 25, 741 P.2d at 475, *see also Nealis v. Baird,* 1999 OK 98, ¶ 45, 996 P.2d 438, 456. By making that showing, the plaintiff can survive a motion for summary judgment or motion for directed verdict and have a chance of persuading a jury that "the increase in risk under the circumstances was more likely than not a substantial factor in causing the harm." *McKellips,* 1987 OK 69, ¶ 25, 741 P.2d at 475. An expert's specific statement that the defendant "caused" the plaintiff's harm, rather than "contributed" to the plaintiff's harm, is not required.

¶ 26 In this instance, the uncontradicted evidentiary material establishes that Williams had a 75–80% chance of survival when he walked into the emergency room at Mercy Health Center and less than a 5% chance of survival when he left five hours later and that this change was due to the enema prescribed by Defendants. This is precisely the situation contemplated by the "loss of chance" doctrine.

### CONCLUSION

¶ 27 The evidentiary material supports the reasonable inference that Williams died from complications of the medical condition that led him to seek medical treatment at Mercy Health Center ten hours before he died and that, had he received appropriate medical care at Mercy Health Center, he probably would not have died. The trial court erred, therefore in granting summary judgment to Defendants based on a lack of evidence on causation.

**CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS' OPINION VACATED; DISTRICT COURT'S JUDGMENT REVERSED; AND MATTER REMANDED FOR FURTHER PROCEEDINGS.**

CONCUR: WATT, C.J., LAVENDER, OPALA, EDMONDSON, TAYLOR, COLBERT, JJ.

CONCUR IN PART DISSENT IN PART: HARGRAVE, J.

DISSENT: WINCHESTER, V.C.J.

NOT PARTICIPATING: KAUGER, J.