2003 OK 16

Geraldine JOHNSON, Administratrix of the Estate of Henry Johnson, Deceased, Plaintiff/Appellant,

v.

HILLCREST HEALTH CENTER, INC., an Oklahoma corporation, Defendant/Appellee.

No. 97,076.

Supreme Court of Oklahoma.

Feb. 18, 2003.

Rehearing Denied June 2, 2003.

Michael J. Heron, Daniel L. Cox, Oklahoma City, OK, for Defendant/Appellee.

KAUGER, J.

¶ 1 The issues presented on certiorari are: 1) whether sufficient evidence exists to raise material issues of fact concerning whether the hospital breached the applicable standard of care and whether its breach may have caused or contributed to the death of the patient; and 2) whether the doctor's decision to discharge the patient from the hospital a second time was an intervening cause of the patient's injuries as a matter of law.[1] We hold that summary judgment is precluded because: 1) sufficient evidence exists to raise material issues of fact concerning whether the hospital breached the applicable standard of care and the degree to which the breach may have caused or contributed to the patient's death; and 2) the summary judgment materials do not support a determination, as a matter of law, that the doctor's second discharge of the patient was an intervening cause of the patient's death.

## FACTS

¶ 2 This cause concerns a negligence suit brought by the appellant, Geraldine Johnson (wife), the administratrix of her husband, Henry Johnson's (husband/patient/Johnson) estate, against the appellee, Hillcrest Heath Center (Hillcrest/hospital) of Oklahoma City, Oklahoma. On December 11, 1997, Johnson sought treatment for chest pains at the Hillcrest emergency room at about 10:30 a.m. The emergency room physician, concerned that Johnson's chest pains could be a heart attack, admitted Johnson to the hospital at about 1:45 p.m. for further testing under the care of Dr. Jozef Dzurilla (Dzurilla/doctor).

¶ 3 In 1997, laboratory blood tests known as CPK and CKMB isoenzyme tests (lab tests) were used to rule out a possible heart attack.[2] After initial testing, if the total

Howard K. Berry, III, Oklahoma City, OK, for Plaintiff/Appellant.

1. The Court of Civil Appeals held that the issue of whether sufficient evidence exists to raise material issues of fact concerning the hospital's breach of the applicable standard of care and causation was dispositive. Consequently, it did not reach the intervening cause issue. When this court vacates the opinion of the Court of Civil Appeals, we may address any issue properly raised in the appeal or remand the cause to the Court of Civil Appeals for that court to address such an issue. Rule 1.80, 12 O.S.2001, Ch. 15, App. 1, Oklahoma Supreme Court Rules. *Hough v. Leonard*, 1993 OK 112, ¶ 18, 867 P.2d 438.

2. Stedman's Medical Dictionary, 26th Ed.1995 defines CPK as creatine phosphokinase and CK as creatine kinase. According to the pathologist, CKMB or CPKMB is one of the three isoenzymes

CPK level appeared elevated the laboratory would perform a CKMB test to identify myocardial heart isoenzymes to aid in determining if someone was experiencing a myocardial infarction commonly known as a heart attack. At 5:42 a.m. on December 12, 1997, a CPK isoenzyme test was performed on Johnson's blood. Because the test showed an elevated CPK level, the blood sample was submitted for a CKMB isoenzyme test.

¶ 4 According to the laboratory and the hospital, the raw data from the lab tests which indicated an abnormal range were posted to the hospital computer system by 11:26 a.m. on December 12, 1997. The test results, along with the pathologist's report (lab report) interpreting the results and suggesting that the patient had an "[e]arly acute myocardial injury," would ordinarily be placed in the patient's chart after the test results were posted to the computer system. However, Johnson's test results were apparently placed in the wrong chart on December 12, 1997. The raw data from the lab tests was available on computer terminals located throughout the hospital, including Johnson's floor, but the pathologist's report was not on the computer. Dr. Dzurilla, without checking the computer, concluded that Johnson was not suffering from a heart attack and Johnson was released at 11:40 a.m. on December 12, 1997.

¶ 5 The next day, Johnson was readmitted to the hospital again under the care of Dr. Dzurilla still complaining of chest pains. The doctor treated Johnson and discharged him on December 15, 1997. Dr. Dzurilla insists that the lab tests and the lab report were not in Johnson's chart during either of his stays at Hillcrest and that, had he seen the information, he would have confirmed the tests results and consulted with a cardiologist rather than discharge Johnson.

¶ 6 On December 19, 1997, Johnson was admitted to Southwest Medical Center where he was diagnosed and treated for a heart attack. Johnson later died at Southwest on December 21, 1997. On December 2, 1998, Johnson's wife filed a negligence action against the doctor. Subsequently, she amended her petition to include claims against the

separated in a CK or CPK test which refers to

pathologist and the hospital. On June 22, 2000, the wife dismissed her claim against the pathologist. After settling with the doctor, she dismissed her claim against him on August 20, 2001.

¶ 7 On September 4, 2001, the hospital filed a motion for summary judgment, arguing that the wife could not show that it breached the applicable standard of care or that it caused or contributed to Johnson's death. On November 8, 2001, the trial court, without hearing arguments, entered an order granting summary judgment in favor of the hospital. Johnson appealed, and on July 25, 2002, the Court of Civil Appeals affirmed. We granted certiorari on October 21, 2002.

## I.

¶ 8 **SUFFICIENT EVIDENCE EXISTS TO RAISE MATERIAL ISSUES OF FACT CONCERNING WHETHER THE HOSPITAL BREACHED THE APPLICABLE STANDARD OF CARE AND THE DEGREE TO WHICH THE BREACH MAY HAVE CAUSED OR CONTRIBUTED TO THE PATIENT'S DEATH.**

¶ 9 The wife's negligence claim against the hospital primarily concerns its alleged failure to post the lab tests and the lab report to her husband's chart and/or call them to the doctor's attention before Johnson was discharged from Hillcrest on December 12, 1997, and December 15, 1997. She asserts that: 1) the trial court erred in granting summary judgment to the hospital because her evidence establishes an actionable negligence claim against the hospital; and 2) material fact questions exist which preclude summary judgment.

¶ 10 The hospital argues that the wife's expert testimony evidence fails to establish an actionable negligence claim because she cannot show: 1) a breach of the applicable standard of care in its handling of the lab test or lab report; and 2) a causal link between the alleged deficiencies in its handling of the report and the death of the patient. In support of its argument, the hospital points to the deposition of the wife's expert

myocardial or heart.

witness in which the expert testified that: 1) the hospital's posting of its lab tests to the computer was an acceptable method of conveying the results to the doctor;[3] and 2) the lab report interpreting the lab tests was not necessary to diagnosis the heart attack in this case.[4]

3. The deposition of the wife's expert, Dr. Albert J. Kolibash, provides in pertinent part at:

p. 71

"... Q: If the system there at Hillcrest Health Center is this information is also available by computer on—in the ICU or the patient's floor, I suspect, much like it is here at your hospital, if this information is available by computer, is that an appropriate—for the hospital an appropriate process for them to follow.
A: The information is available on the computer, the computer is accessible to the physician and it's there within a reasonable period of time, yes, that's acceptable.
Q: Okay. If the evidence will be that this information is also available and would have been available on the second admission to the physician, is that also appropriate?
A: It's appropriate that it's available on the second admission, but it's inappropriate if that's the first time that that was available to the physician.
Q: We've already established that this was available the first go around.
A: I'm sorry. Then the answer to your question is yes...."

pp. 63–65

"... Q: How would those results in 1997 here at the Ohio State University Medical Center be relayed to you as a patient's physician?
A: Via computer.
Q: Is there—Okay.
A: Electronically.
Q: I take it once they're done in the lab, the lab personnel entered it into a computer and it's relayed directly to the floor or unit where that patient is?
A: Yes, sir.
Q: Is it then printed off on a printer?
A: If—No. we're trying to go to electronic records and we have the capabilities now to do this—This is the modern age, I guess, of computer technology where we can pull up all laboratory studies on any patient if you have those privileges. I can do it from my home even.
Q: Could you do that in 1997?
A: We were starting at that time. I don't remember. We—we could—We did have all the information put on computers in 1997, but we didn't go to—We also—We also had hard copies at that point in time.
   Our operations here are a little bit different. We have house staff, residents and as well as fellows. It's a teaching hospital. So this information is—is these—This is how we train these kids to get this information right away,

but the answer to your question is we would obtain this information both electronically and by a hard copy, both methods.
Q: If, in 1997, at Hillcrest Health Center, both methods were available to the physician, would that be acceptable?
A: Yes...."

4. The deposition of the wife's expert, Dr. Albert J. Kolibash, provides in pertinent part at:

pp. 69–70:

"... Q: Okay. If—if the evidence is that these values in that form was transported by computer to the floor where this patient was, would that be enough for you as this patient's doctor, to make a decision on the course of treatment for him?
A: Yes. If they were there that morning.
Q: Okay. Would you have waited to get the isoenzyme impression from the pathologist before you took any action with this patient?
A: No. Because I think that any internist or cardiologist would be able to interpret that in the context of the clinical situation. You have a gradually increasing CPK, the last result of which was above normal. You now have an MB fraction which is 9 percent, which is elevated. You have a patient that presented with chest pain with a number of risk factors. To me, that's a lot of evidence that could create a high suspicion there's a problem. And then I think you have enough evidence here to make a diagnosis of the subendocardial infarction or a non-Q-wave infarction.
Q: And based upon the evidence there in the chart, without the graph that somehow has been placed in the second admission, if we take that out of the equation, just with the evidence in the chart there, would you have enough information available to you to know that this patient had myocardial infarction?
A: Yes. I wouldn't need the graph. As a matter of fact, we don't—we don't even use graphs in our hospital.
Q: Okay. And that was my next question. Is that the same back in 1997, did you use graphs?
A: Not that I remember...."

5. The deposition of the wife's expert, Dr. Albert J. Kolibash provides in pertinent part at pp. 62–63:

"... Q: Okay, Dr. Kolibash, I'm Mike Heron. I represent Hillcrest Health Center in this lawsuit. Let me first just ask you if you have any

¶ 11 The wife counters that her expert's testimony shows that the hospital breached the duty of care that it owed to Johnson and that its breach caused and/or contributed to his injures. In support of her argument she points to her expert's deposition,[5] an affidavit

prepared by her expert witness,[6] and to the deposition of Dr. Dzurilla.[7] Nevertheless, she also insists that expert testimony is not necessary under the facts presented.

¶ 12 To support an actionable claim for negligence, a plaintiff must establish the concurrent existence of: a duty on the part of the defendant to protect the plaintiff from injury; a failure of the defendant to perform that duty; and an injury to the plaintiff resulting from the failure of the defendant.[8]

Negligence on the part of a hospital in the care and treatment of a patient consists of doing something it should not have done, or omitting an action it should have taken.[9]

¶ 13 Hospitals have an implied obligation or duty to exercise ordinary care in the delivery of professional services to their patients.[10] A hospital's duty requires such care and protection to a patient as the patient's condition requires.[11] Whether such requirements have been met presents an is-

criticism of any of the care and treatment rendered to Mr. Johnson by Hillcrest Health Center?
A: The only concern I have is how the results of the laboratory studies, particularly the CPK/MB was handled.
Q: Okay. You say it's a concern. Is that a criticism or just a concern?
A: Well, I don't understand how—When—Why is it that the test that was done—Yes, it's a criticism because when I read these records, I found the report of the CPK/MB which was performed on the morning at 8:00 on the 12th on the second hospitalization chart in these records and I—That, to me, seems inappropriate. Why wasn't—My question to myself was why is this test that was done, which is an important test and has significant information on it, why is it in the wrong chart and why was it not made available to the physician on the first hospitalization...."

6. The affidavit of Dr. Kolibash provides in pertinent part:

"... In my opinion as a Board Certified cardiologist and based on my review of material provided to me there was clearly a delay in diagnosing Henry Johnson's heart attack. That delay in diagnosing this heart attack caused or contributed to the death of Henry Johnson.
...
All factors that contributed to Dr. Dzurilla's failure to know and appreciate the results of the December 12th CKMB contributed to the delay that caused or contributed to the death of Henry Johnson.
... The pathologist's interpretation that indicated that there was evidence of 'early acute myocardial injury' that was created on December 12, 1997 should have been posted on the chart on December 12th, 13th, 14th or 15th ...."

7. Dr. Dzurilla's deposition provides in pertinent part:

at pp. 31–33:
"... Q: If someone had brought to your attention the information contained in Plaintiff's Exhibit 3 before he left the hospital on Decem-

ber 12th, would you have asked that he stay in the hospital?
A: I probably would have repeated the test.
Q: Would you have tried to get a cardiologist into the case?
A: Not at that point.
Q: If you had repeated the test and it confirmed the results, would you have got a cardiologist into the case?
A: So if I would repeat the test and if the results was confirmed, yeah, then I would get a cardiologist.
...
Q: Is it a possibility that is was—is was there on the 15th when you discharged him and you just overlooked it?
A: No...."
at p. 36
"... Q: All right. So at any rate if you had seen Plaintiff's Exhibit No. 3, you would have done further tests and based on the results of those tests made a decision about getting a cardiologist into the case or not. Is that a fair statement.
A: Yes...."

8. Kraszewski v. Baptist Medical Center of Oklahoma, 1996 OK 141, ¶ 6, 916 P.2d 241; Phelps v. Hotel Management, Inc., 1996 OK 114, ¶ 6, 925 P.2d 891; Krokowski v. Henderson National Corp., 1996 OK 57, ¶ 9, 917 P.2d 8.

9. City of Okmulgee v. Clark, 1967 OK 56, ¶ 8, 425 P.2d 457; Hillcrest Medical Center v. Wier, 1962 OK 158, ¶ 8, 373 P.2d 45; Duke Sanitarium v. Hearn, 1932 OK 458, ¶ 0, 13 P.2d 183.

10. Franklin v. Toal, 2000 OK 79, ¶ 14, ¶ 18, 19 P.3d 834; Jackson v. Oklahoma Mem'l Hosp., 1995 OK 112, ¶ 12, 909 P.2d 765.

11. Franklin v. Toal, see note 10, supra at ¶ 18; Harder v. F.C. Clinton, Inc., 1997 OK 137, ¶ 11, 948 P.2d 298; Strubhart v. Perry Memorial Hosp. Trust Authority, 1995 OK 10, ¶ 22, 903 P.2d 263 [Degree of care and attention proportionate with physical and mental ailments of patient.]; Rogers v. Baptist General Convention of the State of Oklahoma, 1982 OK 69, ¶ 18, 37 A.L.R.4th 193, 651 P.2d 672.

sue of fact to be determined by the jury.[12] The applicable standard of care and deviations therefrom causing an injury are ordinarily established by expert testimony, unless the common knowledge of lay persons would enable a jury to conclude the applicable standard of care and whether its breach caused the injury.[13]

▮▮▮ ¶14 Title 63 O.S.2001 § 1–705,[14] Oklahoma Administrative Code, 310: 667–19–2 (2001),[15] and Oklahoma Administrative Code, 317:30–5–3 (1995), collectively, also impose upon hospitals a duty to document orders, treatment, tests, and services rendered in a patient's chart.[16] Although neither party cites to these authorities, we are charged with the duty to take judicial notice of statutes and rules promulgated pursuant to the Administrative Procedures Act.[17] Because rules and regulations enacted by administrative agencies and boards pursuant to the powers delegated to them have the force and

---

**12.** *Jackson v. Oklahoma Mem'l Hosp.*, see note 10, supra at ¶ 21; *City of Okmulgee v. Clark*, see note 9, supra at ¶ 7; *Hillcrest Medical Center v. Wier*, see note 9, supra at ¶ 7.

**13.** *Boxberger v. Martin*, 1976 OK 78, ¶ 14, 552 P.2d 370 [When physician's lack of care has been such as to require only common knowledge to understand and judge it, expert testimony is not required to establish that care nor is it required to establish the cause of an objective injury where there is other competent evidence to establish the cause with reasonable certainty.]; See, *Strubhart v. Perry Memorial Trust Authority*, 1995 OK 10, ¶ 33, 903 P.2d 263 [Unless conduct of doctor is obviously incompetent conduct, expert testimony is needed to show the conduct is a type that would lead hospital to take precautionary steps because expert testimony is required where the fact in issue is not within the realm of ordinary experience of mankind.]; *Turney v. Anspaugh*, 1978 OK 101, ¶ 20, 581 P.2d 1301 [Rule that expert medical testimony is required to support professional negligence case is subject to exception where negligence is so grossly apparent that layman would have no difficulty recognizing it.] See also, *Eversole v. Oklahoma Hospital Founders Ass'n*, 1991 OK 80, ¶ 16, 818 P.2d 456 [No degree of knowledge or skill is required other than that possessed by average person to conclude that allowing a dizzy patient to walk and then allowing him to fall does not ordinarily occur in the care of patients and that its occurrence is presumably a negligent act.]

**14.** Title 63 O.S.2001 § 1–705 provides in pertinent part:
"A. The State Board of Health, upon recommendation of the State Commissioner of Health and with the advice of the Oklahoma Hospital Advisory Council hereinafter provided for shall promulgate rules and standards for the construction and operation of hospital, for which licenses are required by the terms of this article, to provide for the proper care of patients. The promulgations of rules shall be subject to and be governed by the provisions of the Administrative Procedures Act. . . ."
Because the statute has remained unaltered since 1999, references are to its current version.

**15.** OAC: 310:667–19–2 provides in pertinent part:
". . . (b) Record of patient admission.

. . .
(4) Orders for medications, treatments and tests.
(A) All medication orders shall be written in ink and signed by the ordering practitioner authorized by law to order the medication. The order shall be preserved on the patient's chart. Signature stamps shall not be used as a substitute for the signature of the authorizing practitioner.
(B) All orders shall be written in ink and signed by the ordering practitioner. Orders received by resident physicians shall be co-signed if required by medical staff bylaws. The order shall be preserved on the patient's chart. Signature stamps shall not be used as a substitute for the signature of the authorizing practitioner.
(C) All orders taken from the practitioner, for entry by persons other than the practitioner, shall be countersigned as soon as possible. . . ."

**16.** OAC 317:30–5–3 provides:
"Records in a physician's office or a medical institution (hospital, nursing home or other medical facility), must contain adequate documentation of services rendered. Such documentation must include the physician's signature or identifiable initials in relation to every patient visit, every prescription, or treatment. In verifying the accuracy of claims or procedures which are reimbursed on a time frame basis, it will be necessary that documentation be placed in the patient's chart as to the beginning and ending times for the services claimed."

**17.** Title 75 O.S.2001 § 252 provides in pertinent part:
". . . All courts, boards, commissions, agencies, authorities, instrumentalities, and officers of the State of Oklahoma, shall take judicial or official notice of any rule, amendment, revision, or revocation of an existing rule promulgated pursuant to the provisions of the Administrative Procedures Act . . ."
*Davis v. GHS Health Maintenance Organization, Inc.*, 2001 OK 3, ¶ 25, 22 P.3d 1204; *Cox v. Dawson*, 1996 OK 11, ¶ 18, 911 P.2d 272; *Butler v. Oklahoma Horse Racing Comm'n*, 1994 OK 50, ¶ 1, 874 P.2d 1278.

effect of law,[18] they are material and relevant to the issue of the applicable standard of care and its alleged breach.

■ ¶ 15 The obvious purpose of the charting requirement is to provide a record to assist the physician in properly treating the patient. Physicians depend on the reliability and trustworthiness of the chart. As far as a hospital is concerned, there is no more important record than the chart for indicating the diagnosis, the condition, and the treatment required for patients.[19] In our view, no degree of knowledge or skill is required other than that possessed by the average person to conclude that the applicable standard of care required the hospital to include completed lab tests and lab reports in the patient's chart to aid the doctor in diagnosing and treating the patient—regardless of whether lab tests are made available on the computer.[20]

■ ¶ 16 A motion for summary judgment should be sustained only when the pleadings, affidavits, depositions, admissions or other evidentiary materials establish that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.[21] All conclusions drawn from the evidentiary materials submitted to the trial court are viewed in the light most favorable to the party opposing the motion.[22] Even when basic facts are undisputed, motions for summary judgment should be denied, if under the evidence, reasonable persons might reach different conclusions from the undisputed facts.[23]

¶ 17 The evidentiary materials show that the hospital's policy was to include the lab tests and lab reports in a patient's chart as soon as possible. Undoubtedly, doctors would not order the lab tests, nor would pathologists interpret the results if the test and the report did not aid a doctor in diagnosing a heart attack. Nothing in the expert's testimony indicates that the information would not have helped the doctor to make the proper diagnosis.

18. *Cox v. Dawson*, see note 17, supra; *Toxic Waste Impact Group, Inc. v. Leavitt*, 1988 OK 20, ¶ 12, 755 P.2d 626; *Texas Oklahoma Express v. Sorenson*, 1982 OK 113, ¶ 3, 652 P.2d 285.

19. See, *Globe Indemnity Co. of New York v. Reinhart*, 152 Md. 439, 137 A. 43, 45 (1927) wherein the Court, when discussing the admissibility of a chart, described the hospital chart as:
"... [A] record required by the hospital authorities to be made by one whose duty it is to correctly make the entries therein contained. So far as the hospital is concerned, there could be no more important record than the chart which indicates the diagnosis, the condition, and treatment of the patients. This record is one of the important advantages incident to hospital treatment, for it not only records for the use of the physician or surgeon what he himself observes during the time he is with the patient, but also records at short intervals the symptoms, condition, and treatment of the patient during the whole time of the physician's absence. Upon this record the physician depends in large measure to indicate and guide him in the treatment of any given case. Long experience has shown that the physician is fully warranted in depending upon the reliability and trustworthiness of such record. It is difficult to conceive why this record should not be reliable...."

20. We do not comment on what the average person would conclude the applicable standard of care was in this case in 1997, as this is a jury question. Further, we refrain from commenting on whether the standard of care would be different today, given the increased implementation of computer technology in the medical profession since that time. We recognize that medical literature reflects and supports the advent of electronic medical records and even advocates the movement towards the elimination of handwritten clinical data in the foreseeable future. See Amy Jurevic Sokol, J.D., M.H.A. & Christopher J. Molzen, J.D., *The Changing Standard of Care in Medicine: E-Health, Medical Errors, and Technology Add New Obstacles*, 23 J. Legal M ed. 449 (2002); *See also* Charles Safran, M.D., *Electronic Medical Records*: A Decade of Experience, 285 J.A.M.A. 1766 (2001); Dena E. Rifkin, *Electronic Medical Records: Saving Trees, Saving Lives*, 285 J.A.M.A. 1764 (2001). m.D.

21. *K & K Food Services, Inc. v. S & H, Inc.*, 2000 OK 31, ¶ 16, 3 P.3d 705; *Skinner v. Braum's Ice Cream Store*, 1995 OK 11, ¶ 9, 890 P.2d 922; *Buck's Sporting Goods, Inc., of Tulsa v. First Nat. Bank & Trust Co. of Tulsa*, 1994 OK 14, ¶ 11, 868 P.2d 693.

22. *K & K Food Services, Inc. v. S & H, Inc.*, see note 20, supra; *Phelps v. Hotel Management, Inc.*, 1996 OK 114, ¶ 7, 925 P.2d 891; *State* ex rel. *Hettel v. Security National Bank & Trust Co. in Duncan*, 1996 OK 53, ¶ 24, 922 P.2d 600.

23. *Prichard v. City of Oklahoma City*, 1999 OK 5, ¶ 19, 975 P.2d 914; *Kraszewski v. Baptist Medical Center of Oklahoma*, see note 8, supra; *Krokowski v. Henderson National Corp.*, see note 8, supra.

¶ 18 The expert testimony,[24] coupled with Dr. Dzurilla's testimony provide evidence from which the jury could determine causation.[25] On the record presented, the wife's evidence presents facts from which it could be determined that the hospital was negligent. Even if the lab tests were available on the computer, reasonable people might conclude that because the tests were placed in the wrong chart the hospital did not exercise appropriate care given Johnson's medical condition and that the hospital's actions·caused or contributed to his death.

## II.

¶ 19 **THE SUMMARY JUDGMENT MATERIALS DO NOT SUPPORT A DETERMINATION, AS A MATTER OF LAW, THAT THE DOCTOR'S SECOND DISCHARGE OF THE PATIENT WAS AN INTERVENING CAUSE OF THE PATIENT'S DEATH.**

¶ 20 The hospital asserts that, as a matter of law, the doctor's second discharge of the patient caused the patient's death and served as an independent and intervening cause, cutting off any liability on its part. The wife contends that: 1) the determinative issue regarding the hospital's liability is the reasonable foreseeability of the doctor's discharge and the patient's subsequent death and the extent it relates to the hospital's failure to provide the laboratory data which indicated a heart attack; and 2) because the question of reasonable foreseeability is for the jury to determine, summary judgment was improper.

¶ 21 The general rule is that a causal chain between a negligent act and an injury may be broken by an intervening event—a supervening cause.[26] Not every intervening event severs the causal link between the negligent act and injury.[27] When a cause merely combines with another act to produce injury, or several events coincide to bring about a single injury, each negligent actor may be held accountable.[28]

**24.** The hospital argues that the expert's affidavit should not be considered on summary judgment because the wife is merely attempting to create issues of fact by submitting an affidavit which contradicts the deposition testimony. It relies upon two federal court opinions, *Radobenko v. Automated Equipment Corporation*, 520 F.2d 540, 544 (9th Cir.1975) and *Barticheck v. Fidelity Union Bank*, 680 F.Supp. 144 (D.N.J.1988) in support of its argument. The federal decisions are inapplicable and distinguishable on their facts. In both cases the plaintiffs inexplicably offered affidavits directly contradicting their prior depositions in order to avoid summary judgment. Here, conflicting inferences existed within the expert's deposition before the affidavit was ever prepared. For instance, in one portion of the deposition, the expert testified that providing the information via computer is acceptable and that the doctor could have diagnosed the heart attack without the information. See the deposition of the wife's expert, notes 3 and 4, supra. In another portion of the deposition the expert testified that: 1) providing the lab tests and lab reports on computer was acceptable if they were also available in the chart; and 2) the lab tests and reports were significant and important information that the hospital should have made available to the patient's chart on the first hospitalization. See the deposition of the wife's expert, notes 3 and 5, supra. The conflicting inferences between the deposition and the affidavit are for the trier of fact to resolve.

**25.** If a defendant's action contributed to cause a plaintiff's injury, the defendant is liable even though his/her act or negligence alone might not have been a sufficient cause. *Bode v. Clark Equipment Co.*, 1986 OK 21, ¶ 13, 719 P.2d 824. The proximate or contributing cause of a plaintiff's injury is a question of fact for the jury. *Hampton By & Through Hampton v. Hammons*, 1987 OK 77, ¶ 14, 743 P.2d 1053. *Thompson v. Presbyterian Hosp. Inc.*, 1982 OK 87, ¶ 12, 652 P.2d 260. It becomes one of law only when there is no evidence from which the jury could reasonably find a casual link between the negligent act and the injury or where the facts are undisputed. *Busby v. Quail Creek Golf & Country Club*, 1994 OK 63, ¶ 19, 885 P.2d 1326; *Mansfield v. Circle K. Corp.*, 1994 OK 80, ¶ 15, 877 P.2d 1130; *Hampton By & Through Hampton v. Hammons*, see this note, supra. Where uncontroverted facts lend support to conflicting inferences, the choice to be made between opposite alternatives also presents an issue of fact for the jury. *Jackson v. Jones*, 1995 OK 131, ¶ 6, 907 P.2d 1067; *Wetsel v. Independent School Dist. I-1*, 1983 OK 85, ¶ 10, 670 P.2d 986; *Thomas v. Keith Hensel Optical Labs*, 1982 OK 120, ¶ 7, 653 P.2d 201.

**26.** *Bouziden v. Alfalfa Elec. Co-op., Inc.*, 2000 OK 50, ¶ 33, 16 P.3d 450; *Lefthand v. City of Okmulgee*, 1998 OK 97, ¶ 8, 968 P.2d 1224; *Jackson v. Jones*, see note 24, supra at ¶ 9.

**27.** *Jackson v. Jones*, see note 24, supra; *Thompson v. Presbyterian Hosp., Inc.*, see note 24, supra at ¶ 6; *Minor v. Zidell Trust*, 1980 OK 144, ¶ 7, 618 P.2d 392.

**28.** *Id.*

¶ 22 For an occurrence to rise to the magnitude of a supervening cause it must possess three attributes: 1) independence from the original negligent act; 2) adequacy of itself to bring about the complained-injury; and 3) it must not be reasonably foreseeable.[29] If the intervening force is of a character which, under the circumstances, would induce belief that it might be reasonably expected to occur, the final element is not met and the causal chain remains unbroken.[30] Whenever the causal factor under examination qualifies as one of supervening quality, the original negligence may be said to undergo a legal metamorphosis into a remote cause or "mere condition."[31]

¶ 23 We have reviewed the hospital's statement of undisputed facts in its motion for summary judgment and its reply, as well as the evidentiary materials submitted. On the record presented, we have found nothing which would support a determination that the doctor's discharge of the patient, after his second hospitalization, was an intervening cause as a matter of law. When the evidence is presented at trial, a jury might determine that the acts of the doctor and the hospital may be viewed as concurrent acts for which both may be liable.

## CONCLUSION

¶ 24 A hospital's duty requires such care and protection to its patients as the patient's condition requires.[32] Charting provides a record to assist the physician in properly treating the patient. Physicians depend on the reliability and trustworthiness of the chart and as far as a hospital is concerned, there is no more important record than the chart for indicating the diagnosis, the condition, and for treating patients.[33]

¶ 25 Hospitals are required to document orders, treatment, tests, and services rendered in a patient's chart.[34] On the record presented, disputed facts and conflicting inferences from undisputed facts might lead reasonable people to conclude that: 1) even if the lab tests were available on the computer, the hospital did not exercise appropriate care given Johnson's medical condition; and 2) the hospital caused or contributed to the

29. *Bouziden v. Alfalfa Elec. Co-op, Inc.*, see note 25, supra; *Franks v. Union City Public Schools*, 1997 OK 105, ¶ 8, 943 P.2d 611; *Lockhart v. Loosen*, 1997 OK 103, ¶ 10, 943 P.2d 1074.

30. *Jackson v. Jones*, see note 24, supra; *Atherton v. Devine*, 1979 OK 132, ¶ 4, 602 P.2d 634.

31. *Thompson v. Presbyterian Hospital, Inc.*, see note 24, supra; *Minor v. Zidell Trust*, see note 26, supra. The hospital relies on *Porter v. Norton–Stuart Pontiac–Cadillac of Enid*, 1965 OK 18, 405 P.2d 109 in support of its argument that the doctor's actions as a matter of law cut off any liability on its part. *Porter* involved an indemnity suit between a car dealership and an instrument manufacturer for the injury to the dealership's customer. While an employee of the instrument manufacturer was working on a car, the car lurched forward and ran over the customer. The customer sued the dealership and the manufacturer for negligence. The Court recognized that regardless of whether the dealership failed to maintain a safe premises or failed to warn the customer, the sole cause of the injury was the act of the manufacturer's employee moving the gear selector from neutral to drive. *Porter* is clearly distinguishable from the present cause on its facts. In *Porter*, the dealership's negligence, if any, was so far removed from the causal nexus between its negligence and the instrument manufacturer's negligence, that the Court held that it merely furnished a condition by which the injury was possible and a subsequent act caused the injury. Here, we cannot say that as a matter of law that the hospital was merely furnishing a condition by which the injury could have occurred. Rather, the evidentiary material suggests that it's failure to timely provide the test results could be determined by a jury to have been a cause or contributing factor in doctor's failure to properly diagnosis and treat the heart attack.

32. *Franklin v. Toal*, see note 10, supra at ¶ 18; *Harder v. F.C. Clinton, Inc.*, see note 11, supra; *Strubhart v. Perry Memorial Hosp. Trust Authority*, see note 11, supra; *Rogers v. Baptist General Convention of the State of Oklahoma*, see note 11, supra.

33. See, *Globe Indemnity Co. of New York v. Reinhart*, note 19, supra.

34. Title 63 O.S.2001 § 1–705, see note 14, supra; OAC: 310:667–19–2 see note 15, supra; OAC 317:30–5–3, see note 16, supra.

patient's death. Furthermore, the summary judgment materials do not support a determination, as a matter of law, that the doctor's second discharge of the patient was an intervening cause of the patient's death. Consequently, summary judgment was premature.

**CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS OPINION VACATED; TRIAL COURT REVERSED AND CAUSE REMANDED.**

WATT, C.J., HODGES, LAVENDER, HARGRAVE, SUMMERS, BOUDREAU, JJ., concur.

OPALA, V.C.J., concurs in part; dissents in part.

WINCHESTER, J., dissents.