COLBERT, J.
 

 { 1 On Friday, October 18, 1995, Carmilita Robinson's long-time physician, Craig En-gles, M.D., a board-certified family practitioner, diagnosed her with an inner ear infection. When Mrs. Robinson returned to Dr. Engles' office on Monday morning, October 16, 1995, complaining of vomiting, nausea, and lethargy, Dr. Engles ordered a blood test. The laboratory called Dr. Engles as soon as the results were available that afternoon because they showed a dangerously low blood sodium level of 102 milliequivalents per liter of blood compared to a normal level of 135. Dr. Engles called Mrs. Robinson at home and instructed her to drink Gatorade and Ensure instead of water and to return to his office the next morning. Mrs. Robinson's sodium level had risen to only 103 by the next morning. Dr. Engles kept her at his office for most of the day and administered two liters of an intravenous (IV) normal saline solution. Two blood tests taken during the day showed sodium levels of 105 and 104.8. Dr. Engles consulted Anthony Czer-winski, M.D., an internist specializing in ne-phrology including the treatment of low blood sodium levels and, based on that consultation, hospitalized Mrs. Robinson Tuesday evening.
 

 12 Dr. Czerwinski examined Mrs. Robinson in the hospital Tuesday night and ordered an IV of highly concentrated saline at a slow rate. Because she had passed very little urine during the day, Dr. Czerwinski also had Mrs. Robinson catheterized and requested a urinalysis. A blood test taken early Wednesday morning showed that Mrs. Robinson's sodium level had risen to 120, while the urinalysis indicated that she was passing a great deal of dilute urine (almost pure water). Although Dr. Czerwinski believed there was an error in the test results, he ordered no further tests that day. He did, however, order the IV discontinued. There is no record of the time when the IV was actually discontinued, but if it was allowed to run until it was empty, as indicated in Dr. Czerwinski's notes, it would have continued throughout the day until early evening.
 

 1 3 The next blood test was ordered "stat" by Dr. Engles at 8:80 a.m. on Thursday and showed that Mrs. Robinson's sodium level had continued to rise to 126. Nevertheless, Dr. Engles ordered the IV of highly concentrated saline restarted. That IV was subsequently discontinued by Dr. Czerwinski. Later that day, Mrs. Robinson began having difficulty speaking. Her condition deteriorated over the next few days, she began to behave oddly, and she lost the ability to speak or move. Only after she was transferred to another hospital under the care of
 
 *1257
 
 different doctors was Mrs. Robinson diagnosed with a brain stem injury called central pontine myelinolysys, a permanent neurologic condition caused by too rapidly raising a chronically low blood sodium level.
 

 {4 Mrs. Robinson and her husband brought this lawsuit against Dr. Engles and his employer, Integris South Oklahoma City Hospital Corporation (with its parent corporation, Integris Health, Inc.), as well as Dr. Czerwinski and his employer, Oklahoma Ne-phrology Associates, Inc., d/b/a Oklahoma Nephrology Associates. The matter proceeded to trial against the two employers only. Integris demurred at the close of the Robinsons' evidence and asserted that there was no evidence that Dr. Engles' care caused Mrs. Robinson's injury and that, regardless, Dr. Czerwinski's negligence was a supervening cause of her injury. The district court sustained Integris's demurrer and the trial proceeded against Dr. Czerwinski's employer. The jury found Dr. Czerwinski negligent and awarded damages of $8,841,158.62 to Mrs. Robinson and $2,566,511.46 to her husband. The district court entered judgment on the demurrer in favor of Integris and on the jury's verdict in favor of the Robinsons. See Okla. Stat. tit. 12, § 577 (Third) (2001), It denied the Robinsons' motion for new trial.
 

 15 The Robinsons appealed the denial of their motion for new trial The Court of Civil Appeals affirmed and we granted the Robinsons' petition for certiorari.
 

 STANDARD OF REVIEW
 

 16 We review a trial court's order denying a motion for new trial for error of a pure question of law or for an abuse of discretion which is arbitrary, clearly against the evidence, and manifestly unreasonable. See State v. Vaughn, 2000 OK 63, ¶8, 11 P.3d 211, 214; Dominion Bank of Middle Tenn. v. Masterson, 1996 OK 99, ¶16, 928 P.2d 291, 294. Here, the motion for new trial was based on alleged error in granting a demurrer to the evidence. When considering a demurrer to the evidence, the trial court must assume the truth of all facts, along with all reasonable inferences to be drawn from those facts, favorable to the party against whom the demurrer is directed. Thompson v. Presbyterian Hosp., Inc., 1982 OK 87, ¶6, 652 P.2d 260, 262. The court may not sustain a demurrer "unless there is an entire absence of proof to show" that a plaintiff has any right to recover. Id. ¶6, 652 P.2d at 262-63.
 

 DISCUSSION
 

 T 7 Taken in the light most favorable to the Robinsons and with all reasonable inferences in their favor, the evidence presented thus far is as follows: Mrs. Robinson had chronic hyponatremia. Hyponatremia is considered chronic when it has persisted long enough that the body and brain have adjusted to the low sodium level. "Chronic" in this sense does not necessarily refer to a long-term condition and can develop within hours. It occurs when blood sodium levels drop very gradually or when a critically low level has persisted for more than a few hours. The primary indicator is a lack of significant external symptoms such as seizures or even death. Mrs. Robinson's hyponatremia was certainly chronic by the time she was hospitalized and was probably chronic when it was first diagnosed by Dr. Engles on Monday. A blood sodium level as critically low as Mrs. Robinson's requires immediate hospitalization.
 

 [4] T8 When hyponatremia has become chronic, the blood sodium level must be raised gradually to allow the body and brain to become re-accustomed to the higher level. Mrs. Robinson's blood sodium level rose too quickly and she suffered an irreversible brain injury as a result. It has been established that Dr. Czerwinski was negligent in his care of Mrs. Robinson because he failed to closely monitor her blood sodium level and allowed it to rise too quickly. The issue before us is whether the trial court erred in holding that the Robinsons did not submit sufficient evidence as a matter of law that any negligence by Dr. Engles was also a cause of Mrs. Robinson's brain injury.
 

 19 A prima facie case of medical malpractice, like all negligence claims, contains three elements: "(a) a duty owed by the defendant to protect the plaintiff from injury, (b) a failure to properly exercise or
 
 *1258
 
 perform that duty and (c) plaintiff's injuries proximately caused by the defendant's failure to exercise his duty of care." Thompson, 1982 OK 87, ¶7, 652 P.2d at 263. A defendant whose conduct contributed to cause a plaintiff's injury is liable for the injury even if his conduct was not sufficient by itself to cause the injury. Johnson v. Hillcrest Health Ctr., Inc., 2003 OK 16, ¶18 n. 25, 70 P.3d 811, 819 n. 25. The cause of a plaintiff's injury is normally a question of fact for the jury to decide. Id. Causation becomes a question of law only when there is no evi-denee and no reasonable inference from the evidence "from which the jury could reasonably find a causal link between the negligent act and the injury." Id. Rephrased, the legal question is narrowly focused on whether a reasonable person could believe that the defendant's negligent conduct was a cause of the plaintiffs injury. McKellips v. St. Francis Hosp., Inc., 1987 OK 69, ¶10, 741 P.2d 467, 471.
 

 10 The Robinsons' expert witness, Richard Sterns, M.D., who is board-certified in internal medicine and nephrology, testified that Dr. Engles violated acceptable standards when he did not hospitalize Mrs. Robinson as soon as he knew of her critically low blood sodium level. Dr. Sterns' conclusion was seconded by another of the Robinsons' experts, Jerome M. Daniel, M.D., who is board-certified in family practice. Dr. Sterns also testified that Dr. Engles' initial treatment created the conditions that caused Mrs. Robinson's blood sodium levels to rise so quickly in the hospital. He explained that there are two ways to raise the concentration of sodium in the blood, by adding sodium (or saline) or by removing excess fluid. When he gave Mrs. Robinson so much sodium in his office before she was hospitalized (more, indeed, than she received in the hospital) in a diluted solution, Dr. Engles did both: added sodium and encouraged her kidneys to excrete excess fluid by filling her blood vessels with fluid. Dr. Sterns testified that Dr. En-gles and Dr. Czerwinski were both negligent and that their negligence combined to produce Mrs. Robinson's injury.
 

 T11 The trial court granted Integ-ris's demurrer because no expert used the phrase "reasonable medical probability" to describe the degree to which Dr. Engles negligence caused Mrs. Robinson's injury. That basis is too narrowly focused. Our case law requiring a medical malpractice plaintiff to produce evidence that her injuries were caused by a particular physician's negligence has never required that she produce experts who will utter a particular magic phrase but has focused instead on the particulars of each case. While the plaintiff must present evidence to remove the cause of her injuries from the realm of guesswork, she need not establish causation to a specifically high level of probability merely to withstand a demurrer to the evidence. Neese v. Shawnee Med. Ctr. Hosp., Inc., 1981 OK 37, ¶¶ 20-24, 626 P.2d 1327, 1331. "Absolute certainty is not required." McKellips, 1987 OK 69, ¶11, 741 P.2d at 471.
 

 {12 Similarly, the Court of Civil Appeals artificially separated Dr. Engles' treatment and its results into pre- and post-hospitalization scenarios. This too narrowly tailored the analysis and artificially simplified a complicated situation. While Mrs. Robinson did not manifest an injury before she was hospitalized, there was evidence that Dr. Engles sub-standard treatment before her hospitalization directly influenced the rise in her sodium levels after she was hospitalized. The fact that Mrs. Robinson's injury did not manifest until after she was hospitalized and Dr. Czerwinski also contributed to her substandard treatment does not establish that Dr. Engles care was not a cause of the injury. By dividing Dr. Engles' care of Mrs. Robinson into pre- and post-hospitalization, the appellate court lost its proper focus on the causal effect of the totality of that treatment. See Jones v. Mercy Health Ctr., Inc., 2006 OK 83, ¶24, 155 P.3d 9 (petition for reh'g filed)
 

 $18 This situation is somewhat like those presented in "loss of chance" cases such as McKellips.
 
 [1]
 
 While the Robinsons
 
 *1259
 
 did not plead "loss of chance" as a theory here, the principles underlying that doctrine are instructive because its foundation is "the special relationship of the physician and the patient." Hardy v. Sw. Bell Tel. Co., 1996 OK 4, ¶21, 910 P.2d 1024, 1029 (discussing MeKellips ). For example, we generally accept the principle that "[hjealth care providers should not be given the benefit of the uncertainty created by their own negligent conduct." McKellips, 1987 OK 69, ¶ 23, 741 P.2d at 474. A patient's recovery should not be denied when there has been an "irrefutable loss suffered by reason of conduct which breaches the duty imposed to prevent the very type of harm the plaintiff ultimately sustains." Hardy, 1996 OK 4, ¶18, 910 P.2d at 1028.
 

 T14 The Robinsons presented evidence that Dr. Engles' care fell below the standard of care for family practitioners and, at a minimum, set the stage for the too-rapid correction of Mrs. Robinson's chronically-low blood sodium level. This is precisely the kind of scenario addressed in section 328 of the Restatement (Second) of Torts (1965), adopted by this Court in McKellips:
 

 One who undertakes ... to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
 

 (a) his failure to exercise such care increases the risk of such harm....
 

 The Robinsons produced evidence that Dr. Engles' conduct contributed to cause Mrs. Robinson's injury even if it was not sufficient by itself to cause the injury. See Johnson, 2003 OK 16, ¶18 n. 25, 70 P.3d at 819 n. 25. Dr. Engles' negligence in treatment and delay in hospitalization created much of the uncertainty as to the cause or causes of Mrs. Robinson's injury; he may not profit from that uncertainty. See McKellips, 1987 OK 69, ¶23, 741 P.2d at 474.
 

 115 The Court of Civil Appeals erred when it referred to the standard this Court set forth in Johnson, that negligent conduct can be a cause of an injury even if it was insufficient by itself, as "a less rigorous standard of causation," and relied instead on the syllabus of City of Okmulgee v. Hemphill, 1938 OK 474, 83 P.2d 189. In Hemphill, a pedestrian was struck by a car when he detoured along the roadway to avoid a large puddle of water. We held that the city's negligence in allowing the accumulation of water was not a cause of the injury, but merely furnished the condition that made the injury possible. The Court of Civil Appeals focused on rather absolute language in the syllabus that an "efficient" (and actionable) cause must be sufficient by. itself to cause the injury.
 

 Where several causes producing an injury are concurrent and each is an efficient cause without which the injury would not have happened, the injury may be attributed to all or any of the causes.
 

 Id. at ¶0, 83 P.2d 189 (syl. no. 2 by the Court). As the Court of Civil Appeals applied Hemphill, the Robinsons could not recover for Dr. Engles negligence in the absence of direct evidence that her injury would have occurred as a result of that negligence even if Dr. Czerwinski had not been negligent in his treatment.
 

 116 We do not read Hemphill so narrowly. Although our 1980's predecessors adopted absolute language in the Hemphill syllabus to distinguish a concurrent cause from a mere condition, a thorough reading of the analysis in the body of the opinion demonstrates that the Court employed an analysis remarkably similar to that employed in 2003 by this Court in Johnson.
 
 [2]
 
 Indeed,
 
 *1260
 
 Hemphill recognized that the distinction between a concurrent cause and a mere condition is seldom clear-cut, referred to the question as "a difficult one," and offered a more nuanced explanation. Id. ¶10, 83 P.2d at 191.
 

 Concurrent causes are causes acting contemporaneously and which together cause the injury, which injury would not have resulted in the absence of either.... [Flor causes to be concurrent they must join with each other in some manner to produce the injury.
 

 Id. ¶8, 83 P.2d at 191. This closely tracks the language used in Johnson. Whether two causes are concurrent or whether one cause merely creates a condition for the second cause presents a question of fact. Unless the facts are undisputed and point inexorably to one conclusion, that determination is not properly made by the trial court on a demurrer to the evidence.
 

 T17 Integris argues that Dr. Czer-winski's negligence supervened Dr. Engles negligence, breaking any chain of causation between Dr. Engles negligence and Mrs. Robinson's injury as a matter of law. We cannot agree. Based on the evidence presented before the trial court granted the demurrer, Dr. Czerwinski's negligence can not be characterized as a supervening cause as a matter of law. See Graham v. Keuchel, 1993 OK 6, ¶ 9, 847 P.2d 342, 348.
 

 118 "Not every intervening event severs the causal link between the negligent act and injury. When a cause merely combines with another act to produce injury, or several events coincide to bring about a single injury, each negligent actor may be held accountable." Johnson, 2003 OK 16, ¶21, 70 P.3d at 819. To qualify as a supervening cause, an intervening event "must be (1) independent of the original act, (2) adequate of itself to bring about the result and (8) one whose occurrence was not reasonably foreseeable to the original actor." Graham, 1993 OK 6, ¶9, 847 P.2d at 348 (footnote and emphasis omitted).
 

 19 Although the parties have focused on the third element, reasonably foreseeable, we conclude that the evidence thus far has not established that Dr. Czerwinski's conduct satisfies either of the first two elements, independence and adequacy. First, Dr. Sterns concluded and Integris admitted that Dr. Engles and Dr. Czerwinski worked together, at least in part, to provide Mrs. Robinson's care while she was hospitalized. Whether that cooperation was explicit or implicit, Dr. Engles certainly continued to treat Mrs. Robinson in the hospital when he ordered a blood test and restarted the IV on her second full day of hospitalization. Further, although the Robinsons presented no direct expert testimony that restarting the IV was negligent, the totality of the evidence certainly supports the inference that it was negligent for the purposes of evaluating In-tegris's demurrer to the evidence. Mercy Health, 2006 OK 83, ¶ 24, 155 P.3d at 9. Dr. Sterns concluded, moreover, that Mrs. Robinson's injury occurred during that period of time.
 

 20 Second, the Robinsons presented evidence that Dr. Engles actually added more sodium to Mrs. Robinson's blood before her hospitalization than Dr. Czerwinski added after her hospitalization. Dr. Sterns testified that the initial sudden rise in Mrs. Robinson's sodium level was probably due more to the sodium added and the fluid her body excreted as a result of the IV administered by Dr. Engles than to Dr. Czerwinski's slow addition of the more concentrated saline solution. While Dr. Czerwinski might have avoided the harm entirely if he had more closely monitored Mrs. Robinson's sodium levels, we cannot characterize his failure to do so as independent from Dr. Engles' treatment nor can we characterize it as adequate to bring about the harmful result independently of Dr. Engles' treatment. We cannot, therefore, say that Dr. Czerwinski's negligence supervened Dr. Engles' as a matter of law.
 

 CONCLUSION
 

 $21 The Robinsons submitted evidence that Dr. Engles, Integris's employee, was negligent in his care of Mrs. Robinson and that his negligence was a concurrent cause of her injury. Further, the evidence does not support a legal conclusion that Dr. Engles
 
 *1261
 
 negligence was supervened by Dr. Czerwin-ski's subsequent negligence. Therefore, the trial court erred in sustaining Integris's demurrer to the Robinsons' evidence, entering judgment in Integris's favor, and denying the Robinsons' motion for new trial. On remand, the trial court shall vacate that portion of the judgment in favor of Integris and proceed with a new trial of the Robinsons' claims against Integris.
 

 THE OPINION OF THE COURT OF CIVIL APPEALS IS VACATED, THE ORDER OF THE DISTRICT COURT IS REVERSED, AND THE MATTER IS REMANDED FOR FURTHER PROCEEDINGS.
 

 CONCUR: EDMONDSON, V.C.J., _. LAVENDER, OPALA, WATT, COLBERT, JJ., and SIMMS, S.J.
 

 DISSENT: WINCHESTER, C.J., HARGRAVE, TAYLOR, JJ.
 

 RECUSED: KAUGER, J.
 

 [1]
 

 . "Loss of chance" applies when a plaintiff might have suffered the injury without the defendant's negligent act because he was already prone to an injury or was already seriously ill, but the defendant's negligence increased the probability of the injury. In such situations, the
 
 *1259
 
 defendant's conduct has often complicated the plaintiff's efforts. to prove causation. McKellips v. St. Francis Hosp., Inc., 1987 OK 69, ¶12, 741 P.2d 467, 471-72.
 

 [2]
 

 . When City of Okmulgee v. Hemphill, 1938 OK 474, 83 P.2d 189, was issued, the syllabus contained the law of the case and the body of the opinion was merely dictum. Corbin v. Wilkinson, 1935 OK 977, ¶0, 52 P.2d 45 (syl. no. 4 by the Court). However, "tlhe reasoning of the court in the body of the decision is an aid to the correct interpretation of the law as announced in the syllabus." Id.; see also Okla. Stat. tit. 12 § 977 (1961) (repealed by Laws 1968, c. 290, § 3, eff. Jan. 13, 1969); Okla. Tax Comm'n v. McInnis, 1965 OK 204, 10, 409 P.2d 355 (syl. no. 2 by the Court).