2014 OK CIV APP 69

Donald E. ROGERS, as Personal Representative of the Estate of Amy S. Rogers, Deceased, Plaintiff/Appellant,

v.

MERCY HEALTH CENTER, INC., d/b/a Mercy Health Center, Defendant/Appellee.

No. 110296.

Court of Civil Appeals of Oklahoma, Division No. 4.

April 18, 2014.

Certiorari Denied June 23, 2014.

Barry K. Roberts, Norman, Oklahoma, and Glendell D. Nix, Jacob Diesselhorst, Nix Law Group, PLLC, Edmond, Oklahoma, for Plaintiff/Appellant.

Michael J. Heron, Christopher L. Fox, Cody J. Roberson, HERON, FOX & TROUT, P.C., Edmond, Oklahoma, for Defendant/Appellee.

DEBORAH B. BARNES, Chief Judge.

¶ 1 Plaintiff/Appellant Donald E. Rogers (Rogers), as personal representative of the Estate of Amy S. Rogers, deceased, brought an action on behalf of his daughter (Decedent) alleging her death was caused by the

negligence of her attending physician-R. Cullen Thomas, M.D. (Dr. Thomas)—and Defendant/Appellee Mercy Health Center, Inc., d/b/a Mercy Health Center (MHC). Following settlement with Dr. Thomas, the case proceeded to jury trial against MHC. Rogers appeals from the trial court's Judgment memorializing the jury's verdict in favor of MHC. Based on our review, we conclude Rogers was entitled to have the case go to the jury under the aid of a *res ipsa loquitur* instruction for resolution of the disputed issues, and the denial of Rogers' request for such an instruction constitutes a prejudicial error requiring that we reverse and remand for a new trial.

## BACKGROUND

¶ 2 Rogers filed this action in 2007 against Dr. Thomas and MHC. Rogers also named as a defendant Dr. Thomas's employer at the time of the incident, Surgical Specialists of Oklahoma, P.L.L.C.[1] In the amended petition, Rogers asserted that Decedent died in November 2005 at MHC's hospital in Oklahoma City. He asserted that Dr. Thomas negligently provided medical care and treatment to Decedent, and that Surgical Specialists of Oklahoma was vicariously liable under the doctrine of *respondeat superior* for Dr. Thomas's negligence. Rogers also asserted that MHC, through its own agents and employees, negligently provided medical care and treatment to Decedent. Rogers alleged that "[t]he severe personal injuries and death of [Decedent] on November 8, 2005, [were] neither a proximate result of any act or omission of [Decedent], but attributes (sic) wholly to the conduct of all the Defendants herein."

¶ 3 In its answer, MHC admitted that Decedent was a patient at its hospital in Oklahoma City "on or about" November 7 and November 8, 2005, and that she died at MHC's hospital on November 8, 2005. MHC otherwise denied Rogers' allegations and "specifically denie[d] that it was negligent," denied "that any act or omission on its part was the proximate cause of any injury," and asserted, among other things, that any damages suffered by Decedent "were caused by the acts or negligence of a person or persons other than [MHC], over whom [MHC] exercised no control," or "were an unavoidable casualty or inherent physiological problem in [Decedent's] physical constitution...."

¶ 4 In his answer, Dr. Thomas admitted that at the time of the events in question, he provided medical care and treatment to Decedent and that he was acting as an employee of Surgical Specialists of Oklahoma. He otherwise denied Rogers' allegations, and specifically denied he "was guilty of any type of professional negligence," stating, among other things, that "[t]he injuries ... were caused by the acts or omissions of a third party over whom [Dr. Thomas] had no authority to control or direct."

¶ 5 Nevertheless, in September 2008, Rogers reached a settlement with Dr. Thomas and Surgical Specialists of Oklahoma. Rogers filed a dismissal with prejudice as to both defendants, and the case proceeded through discovery and, ultimately, to a jury trial against MHC only.[2]

¶ 6 The "Final Pretrial Conference Order" (Pretrial Order) sets forth the following general facts: Decedent was admitted by Dr. Thomas to MHC's hospital on November 7, 2005, with a "small bowel obstruction," and was scheduled to have surgery on the following day, November 8.[3] During the morning

---

1. Although not pertinent to this appeal, we note that Radiology Consultants, Inc., and James C. Fleming, M.D., were also named as defendants and were dismissed prior to trial.

2. Regarding the discovery phase of this case, Rogers states in his Brief-in-chief that "[t]he matter proceeded slowly through the trial court's docket, with numerous motions on discovery disputes, and the trial court conducted several hearings to sort out the competing demands for production of documents, protective orders, sanctions, and other matters." Br.-in-chief at 2.

3. Oklahoma District Court Rule 5(I) provides, in pertinent part, that a pretrial order

> shall control subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice....
>
> ... The contents of the pretrial order shall supersede the pleadings and govern the trial of the case unless departure therefrom is permitted by the Court to prevent manifest injustice.

Okla. Dist. Ct. R. 5(I), 12 O.S.2011, ch. 2, app.

hours of November 8, Decedent was transferred to the intensive care unit (ICU) where, soon after her arrival, "she coded." At or around 11:32 p.m. on the evening of November 8, Decedent died.

¶ 7 Regarding the general allegations and defenses of the parties, the Pretrial Order further provides as follows:

[Rogers] claims that [MHC] was grossly negligent in [its] nursing care of [Decedent] on November 7 and 8, 2005, and that such acts caused her to suffer severe pain and suffering and wrongful death. [Rogers] is seeking compensatory and punitive damages from [MHC].

[MHC] denies the claims of [Rogers] and states that its nursing care of [Decedent] was at all times appropriate, within the applicable standard of care and not the proximate cause of [Decedent's] death.

¶ 8 The Pretrial Order further provides that MHC contended the "severe small bowel obstruction and subsequent perforation" was the cause of Decedent's death, "not the care and treatment provided by anyone associated" with MHC, and, in the alternative, that "[a]ny damages suffered by [Decedent] and/or her parents were caused by the acts or negligence of a person or persons other than [MHC], over whom [MHC] exercised no control or supervision and with whom [MHC] had no legal relationship, and for whose acts or negligence [MHC] is not responsible...."

¶ 9 Both parties listed Dr. Thomas as a witness. Rogers asserts in his appellate brief that he anticipated Dr. Thomas's testimony at trial "would be the same as in his deposition, and his other prior sworn documents"—i.e., Rogers asserts he anticipated Dr. Thomas would testify that he was not

negligent and that Decedent's death was not the result of his actions or his decision to postpone surgery until the morning of November 8.[4]

¶ 10 In Rogers' motion in limine, he sought to preclude MHC from presenting evidence regarding Rogers' settlement with Dr. Thomas. Rogers also sought to preclude MHC from presenting evidence that the actions of Dr. Thomas, or of any other party other than MHC, were a cause of Decedent's death, arguing that such evidence "would serve to confuse the trier of fact and would be unfairly prejudicial to [Rogers]."

¶ 11 MHC responded that it would attempt to prove Dr. Thomas's negligence was the cause of Decedent's death, and that MHC was not responsible. MHC stated that it had hired Dr. Thomas sometime after the incidents in question, and that Dr. Thomas was now one if its salaried employees. It argued that evidence of Dr. Thomas's settlement was necessary to rebut Rogers' evidence that Dr. Thomas was a highly-paid employee of MHC and was, for this reason, accepting responsibility for Decedent's death.

¶ 12 The trial court denied Rogers' motion in limine regarding evidence of the settlement, and stated at the hearing on the motions in limine that MHC "can put in the fact that [Dr. Thomas] was a party in this case and that he has resolved his dispute with [Rogers]. That's it."[5]

¶ 13 The trial court also stated at the hearing on the motions in limine that Dr. Thomas cannot testify as to the appropriate standard of care for nurses, but

[h]e can certainly ... [testify as to] all he knows about [Decedent] and his care

**4.** As stated above, Dr. Thomas denied he was negligent in his answer, and asserted in his answer, among other things, that Decedent's outcome was the result of "the acts or omissions of a third party over whom [Dr. Thomas] had no authority to control or direct." However, in his deposition, Dr. Thomas stated as follows:

Q. ... You considered [your decision to wait to perform surgery] to be a reasonable decision.
A. I thought it was reasonable at the time.
Q. As you sit here today, was it reasonable?
A. Wasn't the right decision.
....

Q. ... In your opinion, ... after you've had the benefit of reviewing all of this information and seeing the autopsy report, do you have an opinion as to whether the nursing care at Mercy caused or contributed to [Decedent's] death?
A. No, I don't believe it contributed to her death.
Q. And likewise, you-you would agree it did not cause her death.
A. That's correct.
R. at 632–33.

**5.** Tr. of the Motions in Limine at 19.

and treatment and what happened in that and how he dealt with the nurses. That's all facts, that's what he's dealing with. And he can certainly go that far.... [A]nd he can even admit that he fouled up, he was negligent, if that's what he's going to do....

....

... [H]e was the treating doctor. And he has to tell what he knows, what he saw, what he did.[6]

¶ 14 A jury trial was held in November 2011. The transcript of the jury trial proceedings extends through eight volumes and two thousand pages. The appellate record in this case includes four volumes of pleadings and documents, consisting of over eleven hundred pages and, in addition, there are numerous other transcripts, filings, and hundreds of pages of trial exhibits. Pertinent to this appeal, Rogers requested a *res ipsa loquitur* instruction. Rogers' proposed instructions, filed before trial, contain two *res ipsa* instructions: one based on Oklahoma Uniform Jury Instruction—Civil (OUJI) 9.13 for *res ipsa* in negligence cases, and the other based on OUJI 14.14 for *res ipsa* in medical malpractice cases, in particular.

¶ 15 It was Rogers' position at trial that the doctrine of *res ipsa* applies, and an instruction should be given to the jury, because Decedent's condition allegedly worsened, irreversibly, during her transfer from the medical/surgical floor to the ICU, and Decedent was within the exclusive control of MHC nursing staff during the transfer. In argument to the trial court, Rogers asserted that there was a case "wherein a patient was being transferred and was not ambulatory and was being assisted by nursing staff and fell during the transfer and broke a leg or arm ... [or] hip. And the court actually applied the concept and the legal standard of res ipsa loquitur in that case."[7] Rogers asserted that there has been "sufficient evidence produced that during the transfer, [MHC] did have exclusive control over [Decedent]," and sufficient evidence was produced "to support a jury instruction on res ipsa loquitur."

¶ 16 At trial, MHC moved "to throw out the res ipsa loquitur." MHC argued it was not clear what instrumentality Rogers was arguing was within the exclusive control of MHC that caused Decedent's decline in health during the transfer. In its written brief to the trial court on the issue, MHC stated that the doctrine does not apply if certain foundation facts are not established, including that the "injury was proximately caused by an instrumentality solely within the control of the defendant," and that the "injury does not ordinarily occur under the circumstances absent negligence on the part of the defendant," citing, inter alia, 76 O.S. 2011 § 21. MHC asserted that although the question must be left to the jury where the proof is conflicting or subject to differing inferences, some of which are in favor and others against the applicability of *res ipsa,* the foundation facts must, at a minimum, be supported by evidence with sufficient force to create an inference, rather than mere speculation, that they are satisfied.

¶ 17 The trial court sustained MHC's motion, stating: "There has to be some testimony that the injury would not have occurred but for the negligence of someone else, someone from the nursing. I don't have any testimony on that at all, so it's sustained."

¶ 18 The jury instructions given to the jury provide, in part, as follows:

[Rogers] claims that [MHC], acting through its employees and agents, was negligent in its care and treatment of [Decedent] during her November 7, 2005—November 8, 2005 admission, in one or more of the following:

1. Failure to properly monitor and maintain IV fluid;

2. Failure to properly monitor and maintain pain management;

3. Failure to properly transfer [Decedent] from the fourth floor to [ICU];

4. Failure to properly implement and train nurses on pain policy;

5. Failure to properly insure that [the nurse assigned to monitor Decedent be-

---

6. Tr. of the Motions in Limine at 34.

7. Tr. Jury Trial Vol. 5 at 98.

tween 11:00 p.m. on November 7, and 7:00 a.m. on November 8] was competent and remained competent;

 6. Failure to properly follow the policy regarding Narcan; and

 7. Failure to properly assess [Decedent] during the 11:00 p.m. to 7:00 a.m. shift.

[Rogers] claims the negligence of [MHC] caused [Decedent] to suffer pain and ultimately caused her death.

 [MHC] denies that it provided negligent care to [Decedent] and denies that its care was the direct cause of any injury, including death. Instead, [MHC] submits that [Decedent's] death was unavoidable and/or directly caused by [Dr. Thomas's] decision to delay surgery to the morning of November 8, 2005.

¶ 19 The instructions also set forth, and defined, the elements of liability for negligence, and explained that an act or omission of an officer or employee of MHC acting within the scope of his/her employment is deemed to be the act or omission of MHC.

¶ 20 After deliberations, the jury returned a verdict in favor of MHC. In its Judgment filed in December 2011, the trial court memorialized the jury's verdict, and in an order filed in March 2011, the trial court awarded costs to MHC in the total amount of $24,604.90. From the Judgment, Rogers appeals.

### STANDARD OF REVIEW

¶ 21 "[A] jury verdict is conclusive as to all disputed facts and all conflicting statements, and where there is any competent evidence reasonably tending to support the verdict of the jury, this Court will not disturb the jury's verdict or the trial court's judgment based thereon." *Florafax Int'l, Inc. v. GTE Market Res., Inc.*, 1997 OK 7, ¶ 3, 933 P.2d 282 (citations omitted). "Where such competent evidence exists, and no prejudicial errors are shown in the trial court's

instructions to the jury or rulings on legal questions presented during trial, the verdict will not be disturbed on appeal." *Id.* (citation omitted). *See also Lierly v. Tidewater Petroleum Corp.*, 2006 OK 47, ¶ 15, 139 P.3d 897 ("A judgment on a jury verdict is reviewed for competent evidence reasonably tending to support the verdict and for the absence of prejudicial error in the jury instructions and legal rulings.") (citation omitted).

¶ 22 "A reviewing court may not set aside a jury verdict or grant a new trial for misdirection of the jury or error in any matter of pleading or procedure unless the error has probably resulted in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right." *Id.* ¶ 15 (citing 20 O.S.2001 § 3001.1).[8]

¶ 23 Whether a cause presents a case for application of the doctrine of *res ipsa loquitur* presents a question of law. *Harder v. F.C. Clinton, Inc.*, 1997 OK 137, ¶ 9, 948 P.2d 298. We review questions of law *de novo*. *Pletcher v. State ex rel. Dep't of Pub. Safety*, 2003 OK 117, ¶ 3, 84 P.3d 725.

### ANALYSIS

#### I. Res Ipsa Loquitur

¶ 24 Rogers argues the trial court erred by refusing to provide a *res ipsa loquitur* instruction. *Res ipsa loquitur*, which means "the thing speaks for itself,"

> is essentially a rule of circumstantial evidence where a jury in a negligence case is permitted, but not required, to draw an inference of negligence from the happening of an accident of a kind which experience has shown does not normally occur if due care is exercised. The application of the doctrine is allowed where the act is negligent within the common knowledge of a layman.

---

**8.** Section 3001.1 provides:

 No judgment shall be set aside or new trial granted by any appellate court of this state in any case, civil or criminal, on the ground of misdirection of the jury or for error in any matter of pleading or procedure, unless it is

the opinion of the reviewing court that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right.

*Boxberger v. Martin,* 1976 OK 78, ¶ 19, 552 P.2d 370 (footnote omitted). Application of the doctrine is based "upon the theory that common experience ... tells one that, in such a situation and in the ordinary course of events, the injury or damage complained of by the plaintiff would not have occurred in the absence of negligence upon the part of the defendant." *St. John's Hosp. & Sch. of Nursing v. Chapman,* 1967 OK 126, ¶ 0, 434 P.2d 160 (Syllabus by the Court).

¶ 25 The Oklahoma Legislature codified the common law doctrine of *res ipsa loquitur,* at least as it applies to the rendering of medical care, in 1976. Title 76 O.S.2011 § 21 provides in full as follows:

> In any action arising from negligence in the rendering of medical care, a presumption of negligence shall arise if the following foundation facts are first established:
>
> 1. The plaintiff sustained any injury;
>
> 2. Said injury was proximately caused by an instrumentality solely within the control of the defendant or defendants; and
>
> 3. Such injury does not ordinarily occur under the circumstances absent negligence on the part of the defendant.
>
> If any such fact, in the discretion of the court, requires a degree of knowledge or skill not possessed by the average person, then in that event such fact must be established by expert testimony.

■ ¶ 26 "For the rule to apply in a given medical malpractice case, a plaintiff need only prove the three numbered foundational requirements." *Norman v. Mercy Mem'l Health Ctr., Inc.,* 2009 OK CIV APP 55, ¶ 17, 215 P.3d 841 (citing *Middlebrook v. Imler, Tenny & Kugler, M.D.'s, Inc.,* 1985 OK 66, 713 P.2d 572). However, "[n]o more is required by statute than by the common law *to bring* a case within the purview of *res ipsa*

*loquitur* rule." *Harder,* 1997 OK 137, ¶ 12, 948 P.2d 298 (footnote omitted).

*Res ipsa loquitur* is statutorily codified in 76 O.S.2001 § 21. The purpose of the *res ipsa loquitur* evidentiary rule is to aid the plaintiff in making out a *prima facie* case of negligence in circumstances when direct proof of why the harm happened is beyond the power or knowledge of the plaintiff. Under § 21, negligence is presumed to have occurred when the plaintiff establishes an injury which was proximately caused by an instrumentality solely within the control of the defendant and would not have occurred absent negligence on the part of the defendant.

*Smith v. Hines,* 2011 OK 51, ¶ 21, 261 P.3d 1129 (footnotes omitted).

¶ 27 The *Smith* Court further stated:

> The effect of the *res ipsa loquitur* evidentiary rule is merely to raise a rebuttable inference which allows a plaintiff to take the case to the jury and thus avoid a directed verdict for the defendant. Where the *proof is conflicting or subject to different inferences,* some of which are in favor of and others against the applicability of *res ipsa loquitur,* the question must be left to the jury.

*Id.* ¶ 27 (citations omitted).

■ ¶ 28 However, "[n]egligence can never be *presumed* from showing no more than the happening of the harmful event," *Harder,* ¶ 11 (footnote omitted), and "negligence should never be presumed from the mere fact that treatment of the patient was unsuccessful," *Sisson By and Through Allen v. Elkins,* 1990 OK 123, ¶ 6, 801 P.2d 722 (citing *St. John's* ).

■ ¶ 29 Before turning to Rogers' argument regarding the applicability of *res ipsa loquitur,* we must first address MHC's assertion that Rogers failed to preserve any such error on the record as required by 12 O.S. 2011 § 578.[9] We reject MHC's argument

---

9. Section 578 provides as follows:

   A party excepting to the giving of instructions, or the refusal thereof, shall not be required to file a formal bill of exceptions; but it shall be sufficient to make objection thereto by dictating into the record in open court, out of the hearing of the jury, after the reading of all instructions, the number of the particular instruction that was requested, refused and is excepted to, or the number of the particular instruction given by the court that is excepted to. Provided, further, that the court shall furnish copies of the instructions to the plaintiff and defendant prior to the time said instructions are given by the court.

because the parties argued at length on the record in open court, out of the hearing of the jury, regarding the appropriateness of a *res ipsa* instruction, and the trial court ultimately agreed with MHC "to throw out the res ipsa loquitur." [10]

¶ 30 In regard to the three foundation facts set forth in § 21, Rogers asserts in his Brief-in-chief that (1) "[Decedent's] condition took an irreversible turn for the worse during her transfer from the Medical/Surgical floor to [ICU]," (2) "the process of transferring patients between wards within the [hospital]" constitutes an instrumentality solely within the control of MHC that caused the "turn for the worse," and (3) patients do not ordinarily "suffer irreversible brain damage while being moved within a hospital."

¶ 31 Regarding the requirement of an instrumentality solely within the control of defendant that caused the injury, the Supreme Court has stated:

it does not follow that the doctrine of res ipsa loquitur is applicable only in instances wherein some inanimate object was involved in causing the injury or damage complained of by the plaintiff. Even in those instances, it is the peculiar situation involved, not the inanimate object involved, that "speaks" and, in effect, says that negligence on the part of the defendant must have been involved in causing the injury or damage because, as a matter of common experience, in such a situation and in the ordinary course of things, the injury or damage to the plaintiff would not have occurred if the defendant had been exercising the ordinary care required in such a situation. In an otherwise proper situation, the doctrine of res ipsa loquitur is applicable even though an inanimate object was not involved in causing the plaintiff's injury or damage.

*St. John's,* ¶ 0 (Syllabus by the Court). Therefore, Rogers may properly rely on a "peculiar situation" or process rather than on an inanimate object as the "instrumentality." For example, in *St. John's,* the doctrine of

*res ipsa loquitur* was held to be applicable in a case in which a patient's femur was fractured when she was *turned in her bed* by a nurse's aide. *Id.* ¶ 21.

¶ 32 Rogers' argument falters somewhat, however, to the extent he asserts it can be inferred from common knowledge that Decedent's "turn for the worse" was caused by the vague "process of transferring" her to ICU. That is, Rogers' articulation of the foundation facts—especially that it was "the process of transferring patients between wards within [the hospital]" that caused the injury—plainly lacks the "peculiar nature" required for an inference that Decedent's death would not have occurred absent negligence during the transfer. Although Rogers asserted below that *res ipsa loquitur* has been held to be applicable where a patient, assisted by nursing staff, "fell during the transfer" and was thereby injured, Rogers fails in the argument section of his brief to articulate an "accident of a kind which experience has shown does not normally occur if due care is exercised." *Boxberger,* 1976 OK 78, ¶ 19, 552 P.2d 370. This failure is due to the inability to establish, absent more particularizing information, that a "turn for the worse" does not ordinarily occur during the process of transferring patients to ICU absent negligence.

¶ 33 A review of the particular evidence presented by Rogers at trial, however, reveals that testimony *was* elicited during Rogers' case-in-chief in support of the foundation facts.[11] That is, Rogers elicited testimony in support of all of the following: (i) for patients, such as Decedent, suffering from a small bowel obstruction, it is not uncommon to admit them to the hospital for surgery the following day rather than for immediate surgery; (ii) because of Decedent's particular condition she was at risk of vomiting and inhaling that vomit into her lungs (i.e., aspirating); (iii) precautions such as increasing the incline of Decedent's bed, monitoring Decedent for nausea and vomiting, monitoring Decedent's oxygen mask (when she was us-

---

10. In addition, the trial court wrote the word "Refused" on the proposed *res ipsa* jury instructions filed by Rogers.

11. Although not set forth in the argument section of Rogers' brief, many of the following facts are set forth in the background section of his appellate brief.

ing one), keeping a portable suction nearby, and "awake intubation," could and should have been taken by the nursing staff, before and during Decedent's transfer to ICU, to prevent Decedent from aspirating; (iv) before or during Decedent's transfer to ICU, Decedent, nevertheless, vomited and suffered "massive aspiration" that was not discovered until she was examined in ICU; (v) the aspirating of contents of Decedent's stomach and intestines into her lungs through an unprotected airway caused her to stop breathing because she had an airway full of vomit, which caused her to undergo cardiac arrest, which (despite "code blue" resuscitation efforts) resulted in her death; (vi) hospitalized patients in Decedent's condition do not ordinarily aspirate when they vomit, or die as a result of aspirating; (vii) the aspirating could have been prevented or abated; (viii) Decedent's underlying condition of small bowel blockage is a curable condition and, had Decedent not suffered a massive aspiration, Dr. Thomas could have operated on her bowel obstruction and she could have recovered; (ix) Decedent was alert prior to being transported to ICU, but, due to aspirating, she was not responsive, had minimal breathing, did not have a clear airway, and had cyanosis, upon being examined in ICU; (x) upon being examined in ICU, it was discovered there was a large amount of vomit in Decedent's lungs and airway; (xi) no record was made of Decedent's transfer or of the identity of the hospital staff who transported Decedent to ICU; (xii) no record was made of Decedent vomiting or inhaling vomit until her acute respiratory condition was discovered at ICU.

¶ 34 All of the above facts are supported by one or more of the following expert witnesses who testified on behalf of Rogers at trial: Dr. Donald Jason, Associate Professor in the Department of Pathology at Wake Forest University School of Medicine; Dr. John Christein, general surgeon at the University of Alabama at Birmingham, University Hospital; Dr. Dorothy Cooke, Associate Professor of Nursing at St. Louis University School of Nursing; and Dr. Keith Bachman, a retired hospital administrator and physi-

cian. A number of the above facts are also supported by the testimony of Dr. Richard Wood, who was an employee at MHC at the time of the incident, and was the first doctor to arrive at ICU to examine Decedent.

¶ 35 Dr. Wood, who did not testify voluntarily but was subpoenaed by Rogers, testified at trial that as he

arrived in ICU, I believe the nurses were coming through the door with [Decedent] on a stretcher. She was on a nonrebreather [i.e., a type of oxygen mask], she was at about 20 degrees elevation head of the bed, and at that point was not responsive and had minimal respirations.[12]

¶ 36 Dr. Wood testified that upon arrival at ICU, Decedent was already cyanotic and had vomit in her airway. He testified he "emergently intubated" her, a process which involves "placing the tube through the mouth and into the trachea so that the patient's airway can be managed and the patient can be ventilated." He stated that after he intubated her, however, her heart rate started dropping and he called a "Code Blue." He stated that Decedent "coded" because of her low oxygen level and the aspiration, and testified that Decedent had "aspiration pneumonitis" from inhaling gastric contents into her lower airways which caused acute respiratory failure.

¶ 37 Although MHC presented conflicting evidence at trial, "[w]here the *proof is conflicting or subject to different inferences*, some of which are in favor of and others against the applicability of *res ipsa loquitur*, the question must be left to the jury. It is only when one of the foundation facts *is irrefutably negated* that the necessary prop may be deemed knocked out from under the *sine qua non* predicate for application of the *res ipsa* proof pattern." *Harder*, ¶ 10 (footnotes omitted). "*It is for the trier of fact to choose between the favorable inferences to be drawn from the pattern of proof . . . invoked and the defendant's refutational evidence.*" *Id.* ¶ 32 (emphasis in original).

¶ 38 For purposes of determining whether a *res ipsa loquitur* instruction should have been provided, we conclude the evidence pro-

---

12. Tr. Jury Trial Vol. 3 at 170.

duced by Rogers satisfies the three foundation requirements.[13] Rogers presented evidence from which a reasonable jury might infer that Decedent's death was one that would not ordinarily occur in the course of medical care in the absence of negligence on the part of MHC. Rogers met his "probative initiative" by establishing the necessary components for invoking the *res ipsa* doctrine, and was entitled to have the case go to the jury under the aid of a *res ipsa* instruction for resolution of the disputed issues. *See Harder*, ¶ 31. We conclude the trial court erred by failing to provide a *res ipsa* instruction, and this failure constitutes a prejudicial error requiring that we reverse and remand for new trial.

## II. Other Issues Raised by Rogers

¶ 39 Rogers argues the trial court erred by allowing evidence that Dr. Thomas and Rogers reached a settlement, and argues this error "was exacerbated when the trial court—in effect—allowed in information about the settlement which favored the defense but refused to allow information which would have helped [Rogers]." [14] Rogers argues that because the jury was informed about the settlement but not the amount, this partial settlement information led to confusion and to the jury believing that the settlement with Dr. Thomas was for the "entire amount."

¶ 40 Rogers also argues he was denied meaningful discovery and a fair trial because Dr. Thomas "changed his position from one

of being not negligent ... to one of being wholly negligent," and because this change occurred "at the eleventh hour," "it was too late in the pretrial process for [Rogers] to conduct further meaningful discovery." [15]

¶ 41 Having reached the determination above that the Judgment must be set aside and a new trial granted, we do not address these additional issues. However, we find it necessary to express some concern regarding evidence of the settlement between Rogers and Dr. Thomas. Although evidence of a settlement may be admissible when offered for a purpose other than to prove liability for the claim, invalidity of the claim, or the amount of the claim, the trial court is required to exercise discretion and determine whether such evidence should still be excluded because its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, [or] misleading the jury," among other things. *Cleere v. United Parcel Serv., Inc.*, 1983 OK CIV APP 29, ¶ 10, 669 P.2d 785 (citations omitted).[16]

¶ 42 Even if evidence of a settlement truly serves an alternative purpose, the danger of "confusion of the issues" and "misleading the jury" must be taken seriously, especially where the purposes for which evidence of a settlement is *not* admissible—"to prove liability for the claim, invalidity of the claim or the amount of the claim"—would be difficult to disentangle from the alternative purpose. On remand the trial court is free to decide this issue based on the evidence ad-

---

13. In particular, Rogers presented evidence that (1) Decedent died; (2) Decedent's death was proximately caused by (unidentified MHC staff) failing to operate instrumentalities solely within their control—such as the incline of Decedent's bed, Decedent's oxygen mask, a suction to remove vomit before it could be inhaled—all despite Decedent being on powerful pain medication and at high risk of vomiting; and (3) Decedent's death by massive aspiration is not something that ordinarily occurs under the circumstances, absent negligence. Regarding the second foundation fact, the "instrumentality" need not, as stated above, be a particular inanimate object so long as the peculiar situation involved indicates that negligence on the part of defendant must have been involved in causing the injury. *See St. John's*, ¶ 0 (Syllabus by the Court).

14. Br.-in-chief at 24.

15. Rogers asserts that "all pretrial preparation ... was conducted based on the premise that Dr. Thomas would remain consistent in his sworn position that he was not negligent." He asserts he "anticipated that [Dr. Thomas's] testimony would be the same as in his deposition, and his other prior sworn documents." *But see* n. 4, *supra*.

16. The examples of alternative purposes set forth in the applicable statute for which evidence of a settlement *may* be admitted are "proof of bias or prejudice of a witness, negativing a contention of undue delay, or proof of an effort to obstruct a criminal investigation or prosecution." 12 O.S. 2011 § 2408(2).

duced at trial, with the limitation that if evidence of the settlement is found to be admissible, the contents of the settlement agreement must also be admitted.

## CONCLUSION

¶ 43 We conclude Rogers was entitled to have the case go to the jury under the aid of a *res ipsa loquitur* instruction for resolution of the disputed issues, and the denial of Rogers' request for such an instruction constitutes a prejudicial error requiring that we reverse and remand for a new trial.

¶ 44 **REVERSED AND REMANDED FOR NEW TRIAL.**

GOODMAN, J., concurs, and WISEMAN, P.J., concurs specially.

WISEMAN, P.J., concurring specially.

¶ 1 I agree with Rogers' position that MHC should be precluded from presenting evidence of the settlement agreement unless Rogers "opens the door" to that evidence in his own examination of Dr. Thomas by claiming bias connected to his highly paid job with MHC. However, if the trial court at any point allows Dr. Thomas to testify that he was negligent or did not meet the standard of care, then the door has been opened to evidence of the entire settlement agreement and its contents, including the amount paid.